**Jyoti SHAH, Plaintiff,**

v.

**The UPJOHN COMPANY, Defendant.**

No. 1:94–cv–783.

United States District Court,
W.D. Michigan,
Southern Division.

Oct. 25, 1995.

J. Paul Janes, Gruel, Mills, Nims & Pylman, Grand Rapids, MI, Richard J. Howard, Dietrich, Zody, Howard & Vander Roest, Kalamazoo, MI, for plaintiff.

Craig H. Lubben, Miller, Johnson, Snell & Cummiskey, Kalamazoo, MI, for defendant.

### OPINION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

MILES, Senior District Judge.

In this action filed under the Americans With Disabilities Act ("ADA"), plaintiff Jyoti Shah alleges that defendant The Upjohn Company ("Upjohn") violated that statute by failing to accommodate her through reassignment and by ultimately firing her from her employment as a research biochemist because—she alleges—she became allergic to her job. Upjohn has filed a motion for summary judgment, which plaintiff has opposed. For the following reasons, the court hereby **GRANTS** the Upjohn's motion and dismisses this action with prejudice.[1]

### I

In February, 1980, Shah, a Kalamazoo, Michigan resident who holds a bachelor's degree in chemistry, was hired by Upjohn to work as a biochemistry assistant. In 1984, Shah was promoted to the position of biochemist. In 1987, she was again promoted, this time to the position of research biochemist. Although Shah's complaint alleges that this position "initially consisted of research and writing," Complaint, ¶ 7, she has not disputed that the position of research biochemist is a position which requires laboratory work. Shah Dep. at 143–44.

In June, 1989, Dr. Greg Szpunar became the Director of Drug Metabolism and obtained supervisory authority over Shah, who worked in this group. Complaint, ¶ 9. Shortly thereafter, according to Shah, her career at Upjohn began to falter. Plaintiff's

Brief at 2. In August, 1989, after disagreeing with Szpunar over ratings which she received in a performance appraisal, Shah became upset and leveled tacit threats to leave the unit. Memo, 1989 Performance Appraisal (attached as exhibit to Plaintiff's Brief).[2]

In June, 1990, Shah underwent a routine physical examination at Upjohn's Occupational Health (hereinafter "OH") clinic. A blood test completed as part of the examination revealed an elevated level of eosinophils, known as eosinophilia (hereinafter "EOS"). Complaint, ¶ 10. According to Dr. Kenneth Rosenman of the Michigan State University School of Medicine, EOS may be defined as follows:

> We have different types of white cells in our body. And one type of white cell is called an eosinophil. And so [EOS] is an increased number of that particular type of white cell. It's not cancer. Sometimes people think of white cells, they think of leukemia. This just refers to an increase in this type of cell that you typically see with allergies or exposure to certain parasites.

Rosenman Dep. at 9.

In July, 1990, after Shah's EOS was detected, Dr. Daniel Bouwman of Upjohn's OH clinic referred her to Dr. Marshall A. MacDonald, an allergist, for further evaluation. MacDonald saw Shah on July 3, 1990. On August 10, 1990, MacDonald reported to Bouwman that an allergic investigation "failed to show any reason for the itching and [EOS]." Bouwman Aff., Ex. 1. However, because Shah's EOS had disappeared during a four-week period in which she had apparently been out of the lab, MacDonald suggested that Shah avoid working with four specified chemicals which he described as "possible allergens." *Id.* With these restrictions in mind, Shah was released to return to

---

1. Upjohn has requested oral argument on its motion for summary judgment. However, the court has considered the request and has determined that oral argument would not materially aid it in the resolution of the issues presented.

2. Szpunar, who had only recently become Director of Drug Metabolism Research, did not personally observe Shah's performance during the preceding year. However, Shah had requested to meet with Szpunar because she was dissatisfied with the performance review conducted by another scientist to whom she reported.

the laboratory. Bouwman also arranged for Upjohn's environmental services to check Shah's work area to make sure that her ventilating hood was functioning properly and to assess her work area to make sure exposure to chemicals was limited. Bouwman Aff., ¶ 8.

Shah alleges that upon returning to the laboratory, she again began to experience adverse health effects. Upjohn admits that by early 1991, Shah's EOS had returned. Bouwman then referred Shah to Dr. Raymond Lord, a hematologist, who evaluated Shah in February, 1991. At the time of Lord's examination, Shah's EOS was mild and asymptomatic, although she reported having experienced itching and fatigue in May, 1990. Lord Dep. at 6–7.[3] Lord sent a report to Bouwman in which he explained that he had "rul[ed] out any serious reason for the [EOS]" and that

> The eosinophils are mature and would likely, therefore, be a secondary [EOS] to some environmental stimulus. This is not a harmful event in her case, and I do not see at this point any reason to change her lifestyle or occupation on this basis....

Bouwman Aff., Ex. 3. Lord's report also explained that

> [M]any times [EOS] is secondary to a stimulus of which thorough investigation still does not show why the [EOS] is present. Also, in general, [EOS] is usually a benign course that does not cause long-term harmful sequelae.

*Id.* Lord noted that he had reassured Shah that her [EOS] "did not mean the beginning of leukemia or a lymphoma" and that she showed no evidence of either of these diseases. *Id.*

In September, 1991, Shah saw Bouwman in the OH clinic, complaining of fatigue and eye irritation. Bouwman decided to consult further with Lord. After reviewing Shah's blood work, Lord reported to Bouwman in October, 1991 that Shah had the impression that her [EOS] was due to her laboratory exposure; however, Lord stated that this view was "not too objective and has a lot of subjective interpretation" by Shah. Bouwman Aff., ¶ 13, and Ex. 4. Lord suggested that Shah be asked to participate in what amounted to a blind trial, whereby she would be asked to keep a diary of her energy level, symptoms, activities, and particular chemicals to which she was exposed. During this period, Shah's eosinophil count would be monitored without informing her of the results. *Id.*, Ex. 4. Dr. Bouwman discussed this proposal with Shah, who said that she would let him know if it was workable for her. Bouwman Aff., ¶ 15.

Shah returned to see Lord again on March 31, 1992. This time, she described symptoms of nausea, vomiting, dizziness, headaches, skin rash, fatigue, and difficulty with coordination. Lord Dep. at 15. Shah alleges that after that visit, Lord recommended that she be assigned to work outside the laboratory. Complaint, ¶ 18. However, an April 13, 1992 letter written by Lord to Bouwman indicates that he recommended only that Shah be assigned to work outside the *chemical* laboratory. Bouwman Aff., Ex. 5. Although no allergen had been identified, Lord believed, based on her reports, that Shah's EOS was work-related. *Id.* at 41.

Bouwman saw Shah in the OH clinic on April 17, 1992. Shah admitted that she had not kept the diary which had been suggested by Lord five months earlier.[4] However, Bouwman nonetheless discussed Shah's situation with management and then decided to refer her to Dr. David Garabrant, a specialist in occupational medicine at the University of Michigan's School of Public Health and School of Medicine in Ann Arbor. Bouwman Aff., ¶ s 17–18.

Garabrant evaluated Shah on June 26, 1992. Although Shah alleges that he found a "temporal relationship" between her labora-

---

**3.** Lord's consultation notes state that Shah was having no headaches or difficulty with hearing; no chest pains, shortness of breath or cough; and no nausea, vomiting, or abdominal pains. Bouwman Aff., Ex. 3. His notes also state that Shah did not give any symptoms of allergic rhinitis, bronchitis, or asthma. *Id.*

**4.** Shah states in her affidavit that she "had two blind blood tests." Shah Aff., ¶ 10. However, she has not disputed that she did not diary her symptoms, activities, or exposures.

tory exposure and her EOS, Complaint, ¶ 20, his report to Bouwman stated in more detail as follows:

> The etiology of her [EOS] is not clear. While there is a temporal association between her periods in the lab and her elevated eosinophil counts there is no clear agent to which she reacts, and no agent which she can identify has been present during all the periods when she has had [EOS]. While I believe it is possible that her [EOS] is caused by something in the laboratory, it is also possible that this association is spurious. I cannot state with a reasonable degree of certainty that her [EOS] is caused by her work in the laboratory.

Bouwman Aff., Ex. 7. Garabrant further stated that "[t]he etiology of her subjective symptom complex remains to be determined[,]" *id.*, and he referred her for a full neurologic evaluation and neurobehavioral assessment based on Shah's complaints of "vague symptoms" of central nervous dysfunction, such as dizziness, fatigue, and difficulty concentrating. *Id.*, p. 5. Garabrant concluded, however, that if the neurologic evaluation "does not reveal any abnormal findings ... it would be appropriate to allow [Shah] to continue to work in the laboratory." *Id.*[5]

On July 14, 1992, Shah sent Bouwman an electronic mail message expressing her distrust of Garabrant for failing to communicate with her sufficiently. Shah also stated that she did not wish to return to the University of Michigan for a neurological or psychological examination, and that her own physician thought there were "many qualified doctors" locally who could perform these examinations. Bouwman Aff., Ex. 8. Shah finally complained of the "definite strain" involved in making the trip to Ann Arbor. *Id.* Bouwman responded with regret, and also, *inter alia*, asking that any recommendations of her

private physician be made in writing. *Id.*, Ex. 9. Shah was temporarily reassigned to work outside the laboratory until the company could determine whether her physical condition prevented her from working in that environment. Szpunar Aff., ¶ 4. She remained outside the lab, performing mostly clerical work, until July, 1993. *Id.*, ¶ s 7, 12.

Shah did not keep the consultations scheduled by Garabrant nor did she complete follow-up testing with him, even though Szpunar, who was kept apprised of the situation, informed Shah in July, 1992 that her failure to do so would result in her return to the laboratory environment. Szpunar Aff., Ex. 1. Shah has conceded that she never underwent neurological or psychological testing. Shah Aff., ¶ 13. By spring, 1993, Upjohn's need for the clerical work being performed by Shah diminished, and Szpunar contacted the OH clinic to determine whether Shah could be returned to the laboratory. Szpunar Aff., ¶ 7. Ultimately, on May 11, 1993, Bouwman signed a release for Shah to return to her usual work, indicating that he could not formulate restrictions on Shah's performance of lab work.[6] Szpunar assigned Shah back to a laboratory effective July 1, 1993, offering her medical monitoring in order to facilitate her return. *Id.*, ¶ 12.

However, upon being notified that she was being returned to the laboratory, Shah presented Szpunar with an "Accommodation Request Form" requesting that she be assigned to a non-laboratory setting. Shah also presented a note from Dr. Lord recommending that Shah be allowed to work outside the laboratory. *Id*, ¶ 13, 14, Ex. 6. By memo dated July 1, 1993, Shah was sent home, with pay, pending further medical evaluation. *Id.*, ¶ 14, Ex. 7.

Shah sought out what she deems to be a "second opinion" from the Cleveland Clinic, where she was apparently evaluated by Dr. Mohamed Hussein on July 7, 1993.[7] At the

---

5. Garabrant personally saw no physical findings which indicated a neurologic disorder, and he found "no identifiable disease" to explain her EOS. Bouwman Aff., Ex. 7, p. 5.

6. Shah had apparently complained that her clerical work, which included xeroxing, had caused her to have foot pain. Complaint, ¶ 25. Bouw-

man's release indicated that Shah should avoid prolonged standing and walking. Bouwman Aff., Ex. 11.

7. It appears undisputed that Upjohn played no part in procuring the Cleveland Clinic evaluation by Dr. Hussein.

time of the examination, Shah was in no acute physical distress. Dr. Hussein's follow-up letter to Shah after the examination states, at one point, that Shah should "not return to the laboratory as continued exposure to allergins [sic] appear to be related to plasma cell dyscrasia."[8] However, Dr. Hussein performed no blood tests on Shah (at her request). Although his review of Shah's "available" records indicated that her "[EOS] and symptomatology appear to be related to work in the laboratory," he found all of Shah's past work-ups to be "unremarkable" based on his review of available records. Plaintiff's Brief, Ex. 34. Moreover, Dr. Hussein also recommended that Shah's eosinophil counts be evaluated for a three to six month period while remaining away from the laboratory, in order to confirm whether her [EOS] was related to chemical or environmental exposure. *Id.*

Shah met with Bouwman at the OH clinic on July 9, 1993. Bouwman believed that since Shah had never completed the University of Michigan evaluation, she should seek another consultation to determine the cause of her EOS and other symptoms, in order to assist in formulating appropriate guidelines and work restrictions. Bouwman Aff., ¶ 28. After this meeting, the relationship between Shah and Bouwman broke down, and Bouwman arranged for additional contacts with Shah to take place through Dr. Evan Kokales, Upjohn's Director of Medical Services. *Id.,* ¶ 29. Nonetheless, Bouwman arranged for Shah to be evaluated by Dr. Kenneth Rosenman, a professor of medicine specializing in occupationally related health conditions at Michigan State University's College of Human Medicine. *Id.,* ¶ 30.

Rosenman reviewed Shah's records and examined her on November 2, 1993. At the time she saw Rosenman, Shah had not worked in a laboratory for 18 months and was experiencing no watery eyes, no skin rash, no runny nose, no nausea, no vomiting, no headaches, no fatigue, and no weakness. Her physical examination was within normal limits. Kokales Aff., Ex. 2. Shah reported a history of occasional nausea at work in the mid–1980's, and a previous skin rash that had been relieved by steroid cream. Shah also reported that her other symptoms began in 1990. *Id.* Rosenman noted that Shah's history was "consistent with exposure to allergen(s) at work." *Id.* He believed that biological specimens were the most likely allergens. *Id.* However, he concluded his report to Bouwman as follows:

> Your final question to me was do any of her conditions prohibit her from ever working in a laboratory again? My answer to this would be no. However, the patient is very much convinced that it would be harmful for her to ever work in a lab again. Compounding this is the fact that she states she has claustrophobia and she states she would be unable to wear any respirator including a positive air pressure hood. If I am correct that her allergic symptoms are secondary to the biological specimens, then she should be able to work in a lab with chemicals without those symptoms occurring. Certain changes that might ease her placement back into a lab that are not directly medical would include a new supervisor and the ability to do her work while seated.[9]

*Id.*

After reviewing Rosenman's report and consulting with Kokales, on January 12, 1994,

---

**8.** Shah has provided neither an affidavit nor deposition testimony of Dr. Hussein, and it is unclear whether she even intends to call him as a witness. However, another of her physicians attempted to decipher Dr. Hussein's statement regarding plasma cell dyscrasia as follows:

> There is a type of cancer, multiple myeloma, that involve the plasma cells. So he's not saying related to cancer per se, but sort of a— what's the word I want to use?—a possible precursor of cancer. It's a dyscrasia. It's a— there are changes in functions and it's poten-

tially a premalignant condition. I would strongly disagree with that.

\* \* \* \* \* \*

> ... That's like saying any patient who has ever come in an allergy office would potentially develop a premalignant cancer condition. Because everybody that sees an allergist—not everybody, but a vast majority of them have [EOS]. This doesn't make sense to me, this statement, at all.

Rosenman Dep. at 40.

**9.** It should be noted that Shah had had a past auto accident which caused her to have some

Szpunar notified Shah that she was to report to work on January 18, 1994 to discuss a new assignment. On January 18, 1994, Shah appeared at Upjohn with another "Accommodation Request Form" as well as another note from Dr. Lord.. Kokales Aff., ¶ 7, Ex. 3. Shah again requested work outside the lab, and Dr. Lord's note stated, *inter alia,* that he recommended that Shah be allowed to work "in a setting in which the laboratory chemicals and biological agents are not within her environment." *Id.,* Ex. 3. However, based on the consultations with Drs. Rosenman and Garabrant, and based on Dr. Lord's prior note of February 27, 1991 indicating that EOS is usually benign, Kokales determined that it was safe for Shah to continue working in the lab with continued monitoring of her condition if she reported illness. Kokales Aff., ¶ 8. Shah was informed that she would be assigned to work in the Biofluids Analytical Laboratory. Szpunar Aff., ¶ 21.

Shah returned to work on January 18, 1994. She met with Szpunar and then spent the rest of the day moving her belongings to the laboratory. *Id.,* ¶ 22. She returned to work the next day. However, Shah has complained bitterly regarding her brief experience in the new position, alleging that she was forced to work next to someone else who was working with biofluids, that she was required to work near a noisy centrifuge, and that she was required to assemble laboratory equipment with which she was unfamiliar. Shah Aff., ¶ 17. Shah alleges that she began feeling ill by 10:00 a.m. on that day. *Id.,* ¶ 19. Just after noon she reported to the OH clinic, complaining of ear pain and headaches. Kokales Aff., Ex. 4. Although no doctor was available, a nurse who examined her ear found it to be normal. Shah scheduled an appointment to see a doctor on January 21 and then, with the approval of her supervisor, Paul Bombardt, Shah went home. Szpunar Aff., ¶ 23; Shah Aff., ¶ 19.

That night, Szpunar called Shah at home and informed her that she was expected to return to work the following day. Szpunar Aff., ¶ 25. He also explained that if Shah was sick, she was required to go to the OH clinic for evaluation, and that she would not be excused from work unless OH confirmed that she could not perform her duties. *Id.* Nonetheless, on January 20, Shah did not report either to work or to the OH clinic. *Id.;* Shah Aff. ¶ 20. Szpunar then telephoned Shah at home and informed her that she was suspended without pay and that she should remain at home until contacted by the company.[10] Szpunar Aff., ¶ 26.

During her suspension from work, Shah saw her family physician, Dr. James Van Hare, on January 24, 1994. At that time, she showed symptoms of only allergic rhinitis; she did not complain of headaches, nausea, vomiting, or any other more serious symptoms. Van Hare Dep. at 15. Shah alleges that Van Hare noted that she was under "stress." However, at this time Van Hare merely wrote to Kokales and suggested that Shah be assigned to work in a non-laboratory setting. Plaintiff's Brief, Ex. 79.[11]

Shah was given what Upjohn has characterized as "one more chance" to continue her employment. Szpunar Aff., ¶ 27. In a letter dated January 28, 1994, he outlined the following conditions of her employment:

1. Tuesday, February 1, 1994 report to your assignment in Paul Bombardt's lab at 8:00 a.m.

2. Adhere to current and future management directions and expectations.

3. If you are ill and cannot report to work February 1, 1994 or any subsequent day, contact P. Bombardt and report

---

back and foot pain. This was noted in Rosenman's report as having no bearing upon her allergy symptoms.

10. Shah states that she was told not to contact anyone at the company. Shah Aff., ¶ 20. This is not a material issue.

11. Shah's responsive brief erroneously suggests that Van Hare prescribed Prozac for her on January 24, 1994. However, his deposition indicates that he did not prescribe it until February 2, after he spoke with Shah on the telephone and found her to be depressed enough to start on an antidepressant. Van Hare Dep. at 20. In any event, Shah has not alleged that she was disabled as the result of a mental impairment, but rather as a result of a physical impairment, her EOS. Complaint, ¶ s 53, 61, 69, and 77.

to [OH] for medical evaluation by 8:00 a.m.

4. If you become ill and cannot complete a normal work day, contact P. Bombardt and report to [OH] for medical evaluation and official release *before leaving the work place.*

Pay for short term, occasional absence will be discontinued after 120 hours.

These expectations are to be adhered to every work day; failure to do so will result in your termination from The Upjohn Company.

Szpunar Aff., Ex. 14. Kokales apparently concurred in these conditions, remaining unconvinced that the laboratory was causing Shah's purported symptoms and believing that the best way to determine the cause of the problem was to have her report to OH for confirmation of her objective symptoms, and, if necessary, an attempt could be made to identify the allergen based on materials to which she had been exposed. Kokales Aff., ¶s 11, 12.

Shah alleges that after receiving the January 28, 1994 letter, her "stress" increased and she sought Dr. Van Hare's advice. On January 31, Van Hare wrote a note indicating that Shah was under "great stress related to the threatened loss of her job." Van Hare also wrote that Shah was scheduled to see a psychiatrist to evaluate her stress. However, he also stated that the only recommendation he could make was that Shah should be allowed to work in a non-laboratory setting. Plaintiff's Brief, Ex. 80. Shah delivered a copy of this letter to OH at 7:30 a.m. on February 1, 1994. Shah Aff., ¶ 22. She did not present herself for medical evaluation nor did she report to work. Kokales Aff., ¶ 13; Szpunar Aff., ¶ 28; Shah Aff., ¶ 22; Shah Dep. at 307. She instead telephoned her supervisor, telling him that she "could not risk my health following their directives to ignore the advice of the doctors." Shah Aff., ¶ 22.

A decision was then made to terminate Shah's employment. Unable to contact Shah at home to give her the news, Szpunar sent her a letter of termination dated February 3, 1994, specifying insubordination as the reason for her termination. Szpunar Aff., ¶ 29, Ex. 15.

Shah applied for several posted non-laboratory positions within Upjohn between July, 1993 and February 2, 1994. Plaintiff's Brief, Ex. "Job Postings." Needless to say, she was not offered any of these positions. Five months after her termination, Shah's EOS returned, suggesting that she was indeed reacting to something outside the laboratory. Lord Dep. at 27–28. However, Shah's symptoms, including headaches, runny nose, watery eyes, and earaches cleared up after she left Upjohn. Shah Dep. at 328–29.

Shah filed her complaint in this action on November 14, 1994. Her complaint includes federal claims under the ADA, 42 U.S.C. § 12101 *et seq.;* state law claims under Michigan's Handicappers' Civil Rights Act ("MHCRA"), M.C.L. § 37.1101 *et seq.;* and a state law claim for intentional infliction of emotional distress.

## II

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.,* 862 F.2d 597, 601 (6th Cir.1988). In evaluating a motion for summary judgment, the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). The party moving for summary judgment bears the burden of establishing the non-existence of any genuine issue of material fact and may satisfy this burden by " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). While inferences drawn from the underlying facts must be viewed in the light most favor-

able to the party opposing the motion, "[w]hen the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Only factual disputes which may have an effect on the outcome of a lawsuit under the applicable substantive law are "material." *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510.

## III

The ADA provides in pertinent part that

No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.

42 U.S.C. § 12112(a). Under the ADA, a disability is defined as

(A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;

(B) a record of such impairment; or

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(2). "Substantially limits" means the person cannot perform the "major life activity" or is

Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same activity.

29 C.F.R. § 1630.2(j)(1)(ii). "Major life activities" must indeed be "major." These have been defined as

... functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

29 C.F.R. § 1630.2(i).

In determining whether an impairment is "substantially" limiting, the court "should" consider

(i) The nature and severity of the impairment;

(ii) The duration or expected duration of the impairment; and

(iii) The permanent or long term impact, or the expected permanent or long term impact, of or resulting from the impairment.

29 C.F.R. § 1630.2(j)(2). In determining whether an individual is substantially limited in the major life activity of working, the following factors "may" also be considered:

(A) The geographical area to which the individual has reasonable access;

(B) The job from which the individual has been disqualified because of an impairment, and the number and types of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (class of jobs); and/or

(C) The job from which the individual has been disqualified because of an impairment, and the number and types of other jobs not utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified because of the impairment (broad range of jobs in various classes).

29 C.F.R. § 1630.2(j)(3)(ii). Therefore, work is included among the "major life activities" addressed in the ADA. However, in order to show that she is substantially limited in the major life activity of working, a plaintiff must prove that she is

significantly restricted in ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills, and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

*Id.*, § 1630.2(j)(3)(i). Regulations promulgated under the ADA specifically allow employers to require medical examinations and/or make inquiries of employees, provided they are job-related and consistent with business necessity. 29 C.F.R. § 1630.14(c). Employers may also inquire into the ability of an employee to perform job-related functions. *Id.*

Similar to the ADA, the MHCRA provides that an employer shall not

Discharge or otherwise discriminate against an individual with respect to compensation or the terms, conditions, or privileges of employment, because of a handicap that is unrelated to the individual's ability to perform the duties of a particular job or position.

M.C.L. § 37.1202(1)(b). Also parallelling the ADA, the MHCRA defines a "handicap" as

(i) A determinable physical characteristic of an individual, which may result from disease, injury, congenital condition at birth, or functional disorder, if the characteristic:

(A) ... substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's ability to perform the duties of a particular job or position or substantially limits 1 or more of the major life activities of that individual and is unrelated to the individual's qualifications for employment or promotion.

M.C.L. § 37.1103(e).

▄▄ In order to qualify for relief under the ADA, Shah must establish the following: (1) that [s]he is a disabled person within the meaning of the ADA; (2) that [s]he is qualified, that is, with or without reasonable accommodation (which [s]he must describe), [s]he is able to perform the essential functions of the job; and (3) that the employer terminated [her] because of [her] disability.

*White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir.1995) (footnote and citations omitted). "The burden is on the plaintiff to establish the existence of an impairment that substantially limits a major life activity as an element of the plaintiff's prima facie case." *Jasany v. United States Postal Service*, 755 F.2d 1244, 1249 (6th Cir.1985). Neither party in this case contends that the analysis under the two statutes at issue varies in material respects, and therefore the court will use the term "disability" or "disabled" as used under the ADA in analyzing the all of the statutory claims together.

In its motion, Upjohn principally challenges Shah's ability to establish that she suffers from a "disability" as that term is defined under the relevant law. According to Upjohn, Shah's alleged reaction to an unspecified allergen in its laboratory does not "substantially limit" a major life activity.[12]

In *Jasany*, 755 F.2d at 1250, a Rehabilitation Act case,[13] the plaintiff claimed that he had been discriminated against in being fired from his employment with the Postal Service because he suffered from a congenital eye condition—strabismus (commonly known as cross eyes)—which prevented him from being able to operate a mail sorting machine. The district court held that the plaintiff was a handicapped person because his eye condition caused him to develop headaches, eye strain, and excessive tearing when he operated the machine. However, the Sixth Circuit held that the plaintiff had failed to establish a prima facie case of handicap discrimination:

... [T]he parties stipulated that Jasany's condition had never had any effect whatsoever on any of his activities, including his past work history and ability to carry out other duties at the post office apart from operation of the [mail sorter]. Based upon this stipulation and in light of our analysis of the statutory definition, we find that the District Court erred as a

---

**12.** Upjohn does not appear to dispute that Shah's condition—described by her as EOS and its alleged "associated adverse health effects" (Complaint, ¶s 53, 61, 69, 77)—is a physical impairment.

**13.** Courts have generally used case law decided under the Rehabilitation Act of 1973, 29 U.S.C. §§ 701–797b, in resolving cases brought under the ADA. *E.g., Valdez v. The Albuquerque Public Schools*, 875 F.Supp. 740, 743 (D.N.M.1994); *Thomas v. Davidson Academy*, 846 F.Supp. 611, 617 (M.D.Tenn.1994).

matter of law in finding that the [plaintiff] was a handicapped person within the meaning of 29 U.S.C. § 706(7).

755 F.2d at 1250 (footnote omitted).

Similarly, in *Maulding v. Sullivan,* 961 F.2d 694 (8th Cir.1992), *cert. denied,* 507 U.S. 910, 113 S.Ct. 1255, 122 L.Ed.2d 653 (1993), also a Rehabilitation Act case, the plaintiff was, like Shah, a chemist who was ultimately fired after she refused to work in a laboratory, claiming that she was allergic to certain chemicals. The district court found,[14] among other things, that the plaintiff had not shown that her sensitivity to chemicals substantially limited a major life activity. An Eighth Circuit panel affirmed, finding "no error in its conclusion that [plaintiff's] ailment would prevent her only from lab work, and that such a limitation does not substantially limit her employment as a whole." *Id.* at 698 (citing *Forrisi v. Bowen,* 794 F.2d 931, 934 (4th Cir.1986) and *Jasany,* 755 F.2d at 1248–49). Other courts have reached similar conclusions where the plaintiff claims to harbor some allergy or hypersensitivity to something in the defendant's workplace. *See Huffman v. Ace Electric Co.,* 3 A.D.Cases 1347, 1994 WL 583113 (D.Kan.1994) (partial summary judgment granted to defendant on ADA claim, where plaintiff developed cough and claimed that hypersensitivity to unknown agents in her workplace prevented her from performing her job); *James v. Runyon,* 2 A.D.Cases 461, 1992 WL 382311 (E.D.Pa. 1992) (summary judgment granted to defendant in Rehabilitation Act case in which plaintiff claimed sensitivity to dust and insect bites prevented her from performing job for which she was hired), *aff'd,* 6 F.3d 779 (3d Cir.1993) (Table). *See also McKay v. Toyota Motor Mfg., U.S.A., Inc.,* 878 F.Supp. 1012, 1015 (E.D.Ky.1995) (summary judgment granted to defendant, where plaintiff, who suffered from carpal tunnel syndrome, failed

to show that she was substantially limited in any major life activity) and *Bolton v. Scrivner, Inc.,* 836 F.Supp. 783 (W.D.Okla.1993), *aff'd,* 36 F.3d 939, 944 (10th Cir.1994) (summary judgment properly granted to defendant where plaintiff failed to present evidence addressing factors in 29 C.F.R. § 1630.2(j)(3)), *cert. denied,* —— U.S. ——, 115 S.Ct. 1104, 130 L.Ed.2d 1071 (1995).

Shah argues that these authorities are distinguishable because she intends to present testimony at trial that "there are thousands of laboratory jobs in this community that [she] is disabled from working." Plaintiff's Brief at 19. Shah's statement is strange, for the undisputed evidence shows that Shah has not identified the source of her previous symptoms. Shah Dep. at 328. Although Shah appears to contend that the suspected allergen could not be identified without some difficulty, *see* Plaintiff's Brief at 14–15 ("Though every doctor who has seen Mrs. Shah agrees that there is probably an allergin in the laboratory which causes her symptoms, none have been able to isolate what the allergin [sic] is"), the undisputed evidence shows that she did not cooperate in blind testing by keeping a diary as suggested by Dr. Lord. Without knowing what, if anything, she is allergic to, there is no way of knowing whether the allergen is present in other laboratories or whether Shah's exposure to it in a laboratory setting could be controlled. Therefore, there is no actual evidence showing that Shah is disabled from performing work in other laboratories. Shah's bare, subjective assertions to the contrary simply do not qualify as evidence. More importantly, however, even if Shah were unable to work in all labs, *Maulding* holds that "such a limitation does not substantially limit her employment as a whole." 961 F.2d at 698.[15]

---

**14.** *Maulding* involved a judicial review of a decision of the Merit Systems Protection Board.

**15.** Even Shah states that during her employment at Upjohn, she "had worked on many assignments outside the laboratory," consisting of approximately five years out of her 14–year employment. Shah Aff. at ¶ 15. Shah also admits that she sought reassignment to and applied for other non-laboratory positions at Upjohn. *Id.* at ¶ 14. This constitutes evidence that Shah believes her-

self to be able to perform work other than in laboratories and that she is therefore not disabled from the major life activity of work.

Shah cites *Daugherty v. City of El Paso,* 56 F.3d 695, 696, 698–99 (5th Cir.1995) for the proposition that Upjohn should have reasonably accommodated her by reassigning her to another position within the company. However, *Daugherty* is not on point, for at issue in that case was whether the plaintiff bus driver, who was diag-

Shah alternatively argues that her situation is distinguishable from *Jasany* because "that was a work-major-life activities case. We have a claim for non-work major life activities." Plaintiff's Brief at 19. Shah contends that she suffers "substantial limitation of major non-work life activities" because, according to her,

> After her allergic reaction developed, Mrs. Shah had major difficulty living. As described in more detail in her affidavit, she lived daily with watery itchy eyes, skin rashes, running nose, headaches, inability to sleep, dizziness, nausea and forgetfulness.
>
> Her rhinitis [16] caused breathing difficulty. This made it hard for her to sleep at night. So, she awoke drowsy and felt listless all day. . . .

*Id.* at 16. Shah also contends that Dr. Hussein told her that "continuing to work in the lab might cause cancer," and that, while she was facing the loss of her job at Upjohn, she and her husband were the subject of an Internal Revenue Service tax evasion investigation. *Id.* at 16–17. Shah argues that these factors, combined, caused her a great deal of anxiety so that, by the time she was fired, she was in such a state of "near paralysis" that Dr. Van Hare had prescribed Prozac for her. *Id.*

Shah's affidavit does not indicate specifically when she began to suffer from her alleged physical symptoms, including "breathing problems." Shah Aff. at ¶ 8. The undisputed evidence, however, shows that in June 1990, when her eosinophil level was first found to be high during a regular annual exam, she was merely suffering from eye and nose irritation and was not even seeking treatment. Shah Dep. at 54. Shah's affidavit states that during an unspecified period thereafter, she was "suffering from some symptoms but I though they were just from a cold"—hardly an indication of substantially limiting "breathing difficulty." Shah Aff. at ¶ 7. When Shah saw Dr. Lord on February 27, 1991, she was asymptomatic. Lord Dep. at 7. Shah did not report any more serious symptoms until March 31, 1992 when she told Dr. Lord that she was experiencing watery, itchy eyes, nausea, skin rashes, headaches, vomiting, dizziness, fatigue, and some lack of coordination of physical activity. Lord Dep. at 15; Shah Dep. at 104. On May 5, 1992, Upjohn removed Shah from the laboratory, and she performed office work until June, 1993. *Id.* at 108, 127. Because there was no more office work available, Upjohn sent Shah home *with pay* on July 1, 1993, Szpunar Aff.. at ¶ 14, where she remained until she was reassigned to a laboratory position beginning on January 18, 1994. *Id.* at ¶ 22. Shah reported for work in the laboratory only on January 18 and part of January 19, 1994. *Id.* at ¶ 22–24. Shah left work early on January 19, 1994 complaining of a headache and ear pain, although her ear exam was normal. Kokales Aff. at ¶ 9, and Ex. 4.

Shah's rather vague affidavit describes no living activities in which she could not engage during any relevant time period. Indeed, the undisputed facts in this case show that during her employment with Upjohn, Shah's symptoms "got better" whenever she was out of the lab, *e.g.*, Shah Aff. at ¶ 8, and that Shah's symptoms disappeared after she was terminated from Upjohn. Shah Dep. at 328–29. If Shah's alleged impairment is considered under the criteria set forth in 29 C.F.R. § 1630.2(j)(2), the facts

---

nosed as an insulin-dependent diabetic, was a *qualified* individual with a disability, not whether he was disabled at all. The issue of reasonable accommodation, through reassignment or otherwise, does not arise if the plaintiff does not suffer from an impairment which "substantially limits one or more of the major life activities" as provided in 42 U.S.C. § 12102(2). Indeed, the court in *Daugherty* stated that because it found other issues in the case dispositive, "we pretermit the question of whether insulin-dependent diabetes . . . constitutes a disability under the [ADA]." 56 F.3d at 697 (footnote omitted).

**16.** "Rhinitis," or allergic rhinitis, was described by Dr. Rosenman as follows:

> Allergic rhinitis shows those of—those people who have it, they have a stuffy or runny nose. And they get that in response to some substance they're allergic to. So you're going to have a stuffed up nose or be blowing it or sneezing it all the time in reaction.

Rosenman Dep. at 19–20. Dr. Rosenman distinguished allergic rhinitis from asthma, noting that "asthma is potentially life-threatening. That's certainly not true of allergic rhinitis." *Id.* at 30.

show that it fails to qualify as "substantially" limiting. Viewing the facts in the light most favorable to Shah, even her most severe symptoms were only present during a one-month period in 1992 before she was removed from the lab; her own affidavit fails to contradict the medical evidence in this regard. Thus, Shah's limitations were short-term in duration. Moreover, although Shah states that she was in a state of "near paralysis" due to various reasons (including the stress of an IRS investigation) by the time she was returned to the lab for less than two days in January, 1994, her own affidavit states that she continued to seek out other non-laboratory positions within Upjohn. Shah Aff. at ¶ 14. This is hardly an indication that her impairment(s) were severe. Finally, although Shah states that she was afraid, based on what she had been told by Dr. Hussein, that she would get cancer if she continued to work in the lab, there is no evidence that Shah ever had cancer. Fear of cancer does not qualify as a disability. Under the circumstances, the court concludes that no genuine factual issue exists that Shah did not suffer from a disability or handicap within the meaning of either the ADA or the MHCRA.

Because the court concludes that no genuine issue exists as to whether Shah is a disabled or handicapped person within the meaning of the relevant statutes, the court finds it unnecessary to address Upjohn's argument that Shah cannot show that she was terminated because of her disability because she has not disputed that she was fired for failing to comply with the requirements listed in Dr. Szpunar's January 28, 1994 letter. However, the court does note that Shah has conceded that she "didn't follow the directives of the January 28 letter literally." Plaintiff's Brief at 18. Although Shah dismisses the letter as a "set up" (Plaintiff's

Brief at 13–14) and argues that "[s]he did not believe that she was being insubordinate," (*Id.* at 18), she has presented no evidence suggesting that insubordination was a pretext for discrimination *on the basis of her alleged disability*. Importantly, she has specifically contended that Dr. Szpunar's alleged "harassment" of her "stem[s]" from his initial dislike of [her]," Shah Aff., ¶ 17, generated after she confronted him regarding her 1989 performance review. Shah Dep. at 346. After the confrontation, according to Shah, "he didn't like me." *Id.* Therefore, according to Shah's own evidence, Szpunar's alleged unfavorable treatment of her arises out of an incident which occurred months before her EOS was even detected.[17]

## IV

Shah has also asserted a state law claim of intentional infliction of emotional distress. This claim is based on the same alleged factual scenario as the statutory claims: that after mid–1990, when Shah's EOS count was found to be elevated, Upjohn threatened Shah with termination if she did not return to the lab, where, according to Shah "injury was certain to occur[.]" Complaint, ¶ s 86–88.

Four elements are generally considered to be essential to a prima facie claim for intentional infliction of emotional distress: (1) extreme and outrageous conduct; (2) intent or recklessness; (3) causation; and (4) severe emotional distress. *Roberts v. Auto–Owners Ins. Co.*, 422 Mich. 594, 602, 374 N.W.2d 905, 908 (1985). Liability may be found " 'only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized commu-

---

**17.** Shah has, somewhat inexplicably, attached to her brief an August, 1989 memo authored by Szpunar and directed to Shah's personnel file, in which he essentially accuses Shah of manipulating her supervisor into giving her a higher than deserved performance appraisal. In the memo, Szpunar states that he had a "heated" meeting with Shah discussing the evaluation. During the meeting Shah "overtly broke down and cried several times," and, "[t]hroughout the interview" made "tacit threats to leave the unit, or to

carry an apparent appeal beyond [Szpunar's] level[.]" This memo, even when viewed in the light most favorable to Shah, at best merely suggests that Szpunar may have had a motive for treating Shah unfavorably because he did not like her, or that he may have disbelieved her subjective complaints (when they later arose) because he perceived that she merely wished to escape his supervision. However, the memo does not establish causation because Shah's alleged disability had not yet surfaced.

nity.'" *Id.* (quoting Restatement Torts, 2d, § 46, comment d, pp. 72–73).

Upjohn argues that its conduct was not extreme and outrageous because it acted reasonably and honorably in dealing with Shah after her EOS was identified. According to Upjohn, the evidence shows that after Shah's June, 1990 regular exam revealed EOS, Upjohn sent Shah to some of the finest specialists in the country and followed their advice. The company also offered Shah protective measures, including special clothing, a ventilator hood, and respirator in an attempt to allow her to continue her work. In the end, Shah was told that she had only to report to occupational health if she felt too ill to work.

Shah's only response to Upjohn's arguments is to argue that her claim for intentional infliction of emotional distress is a jury question because "[i]f Mrs. Shah's evidence is believed by the jury, they may very well conclude that an award should be given[.]" Plaintiff's Brief at 24–25. However, given the "particularly strict standard" for establishing this tort, *see Joumas v. Maryland Casualty Co.,* 698 F.Supp. 675, 679 (E.D.Mich.1988), the court concludes that the evidence is simply insufficient as a matter of law. Shah has presented evidence that she may have been allergic to something in Upjohn's lab. However, the undisputed evidence also shows that Upjohn attempted to discover the nature and source of Shah's EOS, and that it removed her from the lab for an extended period. Other evidence shows that Upjohn had received an opinion from Dr. Lord that EOS "is usually a benign course that does not cause long-term harmful sequelae." Bouwman Aff., Ex. 3. Although Shah argues that she was told at the Cleveland Clinic that she could get cancer from continued exposure to allergens, Shah's own evidence shows that the doctor who evaluated her at the clinic, Dr. Hussein, found Shah's condition to be "unremarkable" after an "extensive work-up" and "detailed examination." Plaintiff's Ex. 34. In view of Dr.

Lord's prior opinion that EOS is usually benign, Upjohn had a basis upon which to disagree with the alleged possibility for development of cancer.

■ It should also be noted that Shah has not contested evidence showing that her job as a research biochemist included working in a laboratory, Shah Dep. at 143–44, and evidence showing that she did not fully cooperate with attempts to evaluate her condition, including a proposal for blind testing of her EOS levels and for a neurologic evaluation. The most damaging evidence against Upjohn is that it required Shah to return to a lab where biofluids were present even though Dr. Rosenman thought these might be the source of her allergy. However, even Dr. Rosenman has testified that it is "very common" for people to continue to work with allergens. Rosenman Dep. at 30. It is not sufficiently extreme and outrageous that Upjohn ultimately sought to require Shah to perform her job and to require confirmation when Shah claimed she was too ill to perform it.

## V

For the reasons stated above, the court hereby **GRANTS** Upjohn's motion and dismisses this action in its entirety.[18]

So ordered.

---

**18.** Given the court's ruling, the court hereby vacates as moot the October 13, 1995 order issued by Magistrate Judge Joseph G. Scoville granting Shah's motion to compel discovery. The information which is the subject of that order is not material to the court's ruling on the issue of disability nor is it material to whether Upjohn's conduct was extreme and outrageous. Accordingly, if Upjohn has not yet complied with the order compelling discovery, it is no longer required to do so.