Carl DAUGHERTY, Plaintiff–Appellee,

v.

The CITY OF EL PASO,
Defendant–Appellant.

No. 94–50212.

United States Court of Appeals,
Fifth Circuit.

July 3, 1995.

Daniel H. Hernandez, Laura K. Norden, Asst. City Attys., El Paso, TX, for appellant.

Howard A. Hickman, Smith & Gopin, El Paso, TX, for appellee.

Before REAVLEY, GARWOOD and EMILIO M. GARZA, Circuit Judges.

REAVLEY, Circuit Judge:

Carl Daugherty was awarded a money judgment against the City of El Paso under the Americans with Disabilities Act (ADA or Act), 42 U.S.C. §§ 12101–12213. We reverse and render.

## BACKGROUND

In 1991 Daugherty was hired by the city as a "coach operator," i.e. a public bus driver. This position was a part-time permanent position under the city's civil service regime. In June of 1992 Daugherty was diagnosed as an insulin-dependent diabetic. As a result of this diagnosis the city placed him on a leave of absence without pay and relieved him of his job as a coach operator. As discussed further below, Daugherty does not argue, nor do we see, that the city violated the ADA by relieving Daugherty of his position as a coach operator upon his diagnosis. Instead, Daugherty argues that a violation occurred because the city failed to pursue a waiver of his disqualification from operating a commercial motor vehicle with the Department of Transportation, and failed to place him in another position on the city payroll.

After a jury trial, the court entered a judgment for $5000 in compensatory damages as found by the jury, together with backpay, interest and attorney's fees as determined by the court.

## DISCUSSION

The city raises numerous arguments on appeal. Among them, it argues that Daugherty does not have a disability under the ADA, that he was not a "qualified individual with a disability," and that the city established as a defense that it acted in good faith to make a reasonable accommodation for Daugherty. To place these arguments in legal context, we briefly set out the relevant contours of the ADA.

The ADA expansively prohibits discrimination in employment against persons with a disability, providing that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). A "disability" includes "a physical or mental impairment that substantially limits one or more of the major life activities of such individual" and "being regarded as having such an impairment." Id. § 12102(2).

A "qualified individual with a disability" means "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." Id. § 12111(8). "Discrimination" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity." Id. § 12112(b)(5)(A). "The term 'reasonable accommodation' may include ... 'reassignment to a vacant position.'" Id. § 12111(9) (emphasis added). However, "[i]t may be a defense to a charge of discrimination under this chapter that an alleged application of qualification standards ... that screen out or tend to screen out or otherwise deny a job ... to an individual with a disability has been shown to be job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation...." Id. § 12113(a). "'[Q]ualification standards' may include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace." Id. § 12113(b). "The term 'direct threat' means a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." Id. § 12111(3).

The city argues that Daugherty's medical condition is not a disability under the ADA. Finding other issues dispositive, we pretermit the question of whether insulin-dependent diabetes, either as a general matter or under the specific facts of this case, constitutes a disability under the Act.[1]

### A. Qualified Individual with a Disability

The city argues that Daugherty was not a qualified individual with a disability. We agree in part. Daugherty was not qualified to perform the essential functions of a city bus driver once he was diagnosed as an insulin-dependent diabetic. He does not argue otherwise. He concedes in his brief that "[t]he Department of Transportation regulations ... prohibited him from operating a truck over 26,001 pounds or a bus which seats more than 16 passengers." The parties stipulated at trial that federal regulations prohibit individuals with insulin-dependent diabetes from operating commercial motor vehicles, i.e. those that weigh more than 26,001 pounds or buses which seat more than 16 people.[2] Daugherty makes no argument that the ADA's requirement that the employer reasonably accommodate the disability would extend to violating federal law.

The city argues that our inquiry should end here. Daugherty argues, however, that as a reasonable accommodation, the city either should have requested a waiver from the Department of Transportation, or reassigned him to another position.

### B. Reasonable Accommodation
#### 1. Waiver of Federal Regulations

■ The Department of Transportation does provide for waivers of its regulatory requirements. There were disputes here as to whether a waiver is possible given Daugherty's medical condition,[3] and the extent to which the city pursued a waiver. Our decision, however, does not turn on these factual issues.

Instead, we believe we are bound by *Chandler v. City of Dallas,* 2 F.3d 1385 (5th Cir.1993). In *Chandler,* the City of Dallas adopted requirements for "primary drivers" whose positions require frequent driving. As in our case, the city followed Department of Transportation regulations which provide that an insulin-dependent diabetic is not a qualified driver. Plaintiff Chandler was deemed unqualified for his primary driver position as an electrical repairman. The district court entered relief in his favor. We reversed and rendered.

In *Chandler,* the claim was brought under the Rehabilitation Act, 29 U.S.C. §§ 701–797b, which prohibits discrimination against individuals with disabilities in programs that receive federal financial assistance. The elements of a cause of action at issue in our case, however, are virtually the same under the Rehabilitation Act and the ADA. As explained above, the ADA prohibits discrimi-

---

1. We note, however, that the Equal Employment Opportunity Commission, in its Interpretive Guidance on Title I of the Americans with Disabilities Act, 29 C.F.R. Part 1630 App. (1994), believes that insulin-dependent diabetes is a disability under the Act:

    The existence of an impairment is to be determined without regard to mitigating measures such as medicines, or assistive or prosthetic devices.... For example, an individual with epilepsy would be considered to have an impairment even if the symptoms of the disorder were completely controlled by medicine. Similarly, an individual with hearing loss would be considered to have an impairment even if the condition were correctable through the use of a hearing aid.

    \*    \*    \*    \*    \*    \*

    Similarly, a diabetic who without insulin would lapse into a coma would be substantially limited because the individual cannot perform major life activities without the aid of medication.

2. *See* 49 C.F.R. §§ 383.5, 383.23, 383.71, 391.41 (1994). The city also produced undisputed evidence that an applicant for a Texas intrastate commercial driver's license must also meet the physical qualifications set out in § 391.41, which requires that the driver have "no established medical history or clinical diagnosis of diabetes mellitus currently requiring insulin for control."

3. *Compare* 49 U.S.C. § 31136 *and* 49 C.F.R. § 383.7 (1994) (general provisions for waiver of compliance with commercial motor vehicle regulations) *with* 49 C.F.R. § 391.49 (1994) (limiting waiver of physical requirements found in 49 C.F.R. § 391.41 to certain impairments not including diabetes).

nation against a "qualified individual with a disability," and discrimination includes not making a reasonable accommodation for "an otherwise qualified" individual with a disability. 42 U.S.C. §§ 12112(a), 12112(b)(5)(A). Similarly, the Rehabilitation Act prohibits discrimination against an "individual with a disability"[4] who is "otherwise qualified." 29 U.S.C. § 794. We also noted in *Chandler* that the two Acts define a disability in substantially the same terms. 2 F.3d at 1391.

In *Chandler*, we reasoned as follows. The definition of a qualified handicapped individual under the Rehabilitation Act includes a personal safety requirement:

[A]n otherwise qualified handicapped individual is defined as one who "can perform the essential functions of the position in question without endangering the health and safety of the individual or others." "[U]nder section 504, an individual is not qualified for a job if there is a genuine substantial risk that he or she could be injured or could injure others, and the employer cannot modify the job to eliminate that risk."

*Id.* at 1393 (quoting *Chiari v. City of League City,* 920 F.2d 311, 317 (5th Cir.1991)). Again, the ADA by its terms recognizes the same safety requirement. It allows qualification standards that "include a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace," and defines a "direct threat" as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. §§ 12113(b), 12111(3).

Pursuing this inquiry further, we held as a matter of law that a driver with insulin-dependent diabetes is not otherwise qualified because his medical condition presents a genuine substantial risk that he could injure himself or others:

The issue whether an insulin dependent diabetic is otherwise qualified for positions involving driving or other high risk activities has been addressed by several federal courts. Those courts have uniformly held that insulin dependent diabetics present an

unacceptable risk, and are thus not otherwise qualified, to be employed as, inter alia, sanitation truck drivers or special agents with the Federal Bureau of Investigation. We are aware of no cases holding that insulin dependent diabetes does not present a significant risk in connection with the operation of motor vehicles on public highways.

We hold that, as a matter of law, a driver with insulin dependent diabetes ... presents a genuine substantial risk that he could injure himself or others. We echo the sentiment expressed by this court in *Collier* [*v. City of Dallas,* 798 F.2d 1410 (1986) ]: "Woe unto the employer who put such an employee behind the wheel of a vehicle owned by the employer which was involved in a vehicular accident."

2 F.3d at 1395 (citations, footnotes omitted).

A waiver of Department of Transportation regulations would in no way address the concern stated in *Chandler;* it might avoid the legal impediment to Daugherty's desire to continue to drive a bus, but it would not alter his medical condition. In our circuit, such a condition, as a matter of law, makes him not "otherwise qualified" to drive a bus under the Rehabilitation Act. For the reasons explained above, this holding likewise compels us to hold that under the ADA Daugherty is not "a qualified individual with a disability" for the position of bus driver. This essential element of his claim is lacking even if the city could have accommodated him by obtaining a waiver.

### 2. *Reassignment*

■ In the alternative Daugherty argues that the city should have made a reasonable accommodation by reassigning him to another position on the city payroll. To be sure, under the ADA a reasonable accommodation "*may* include ... reassignment to a vacant position," 42 U.S.C. § 12111(9) (emphasis added), and the Act defines a qualified individual with a disability as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that

---

**4.** The Rehabilitation Act previously referred to individuals with a "disability" as "handicapped"  individuals.

such individual holds *or desires.*" *Id.* § 12111(8) (emphasis added). Contrary to the city's position, we do not read the statutory reference to employment an individual "desires" as applicable only to job applicants. Instead we read this language as extending to individuals like Daugherty who are already employed and then become disabled, since the broad prohibition against discrimination found in 42 U.S.C. § 12112(a) extends not only to hiring and job application procedures, but to advancement, discharge of employees, "and other terms, conditions, and privileges of employment." The evidence relevant to this issue, disputed where indicated, included the following.

▇ After his diagnosis, Daugherty was placed on leave without pay. The city did provide him with a monthly stipend for some period of time and paid his tuition for retraining. Daugherty was referred to the city's personnel office, which posts job openings. The personnel office does not have authority to hire for other departments, but did apprise Daugherty of several openings. City employment practices generally are governed by city charter, which can only be changed through an election. The charter gives an order of priority for filling vacancies. While employees physically incapacitated from performing their jobs are given the highest priority, full-time employees are given priority over part-time employees such as Daugherty. The city has relatively few part-time positions. The city's director of personnel explained the problems the city would have faced if it had ignored the charter's hiring priorities: "If we were to give Mr. Daugherty a full time position, we might very well have a complaint from an employee who had been waiting for that vacancy for promotion, who had been a full time employee five to ten years, had been preparing for that job and Mr. Daugherty was placed in it with some eight or nine months service, priority over him. I believe we would have had a lawsuit." A part-time employee can move to a full-time position only after taking an original exam or a promotional exam.

The city offered evidence that it did offer a toll booth position to Daugherty, but he rejected it because the pay was too low. Daugherty claims that the position was never actually offered to him. Daugherty applied to take an examination for a fire dispatcher, a position he found posted at the personnel office. He was later informed that he was disqualified from taking the examination, since under civil service rules an employee is not eligible to take a promotional exam unless he has received at least a "meets minimum requirements" rating on the last two performance evaluation reports for his current position. On one such report Daugherty had received a lower "marginal" rating. This report preceded his diagnosis for diabetes, and there was no evidence that his later diagnosed condition played any role in the evaluation.

The personnel office also apprised Daugherty of openings that would be available for airport shuttle bus positions. These positions were not covered by the Department of Transportation regulations discussed above. These were full-time positions. None of the positions were filled by new hires or part-time employees. Daugherty would have needed to take an examination to qualify for the shuttle bus position. While the personnel manager who was working with Daugherty in the personnel office admitted that he did not inform Daugherty of the date of the exam, he did tell Daugherty to look at the job announcement. As for obtaining the application to take the exam, his position was that Daugherty "is a grown man, he should have done it."

The extent to which Daugherty was willing to accept other positions was disputed. On August 19, 1992, he wrote a letter to the city in which he requested that (1) he be reinstated to the coach operator position, (2) the city file a waiver application, and (3) "[a]s a last resort, I wish the City Personnel Office to find a position within the City that I am qualified for with no loss of pay, hours, or seniority." The city's director of personnel explained the difficulties in meeting these demands: "I think primarily what we mean is that to accommodate Mr. Daugherty in the way that he requested accommodation, same pay, same, at least same hours, would have required us to probably put him in a full time position. If we had done that, we would have violated our own rules and regulations, we would have subjected ourselves to a lot of liability, which ends up being an undue hard-

ship not only on the City, but for the taxpayers." Daugherty claims that he was willing to take other positions as well. He testified that he made daily trips to the personnel office, that it would get his hopes up by telling him of positions, and then dash his hopes by telling him later that he was not qualified for them.

Again, we find guidance in a Rehabilitation Act case, *Chiari.* We explained in that case that under that Act, "[t]he City must accommodate [plaintiff's] disease unless it 'can demonstrate that the accommodation would impose an undue hardship on the operation of its program.' For example, the City is not required to fundamentally alter its program. Nor is the City required to find or create a new job for [plaintiff]...." 920 F.2d at 318 (citations omitted). Such an approach is equally applicable to the ADA, which recognizes that an employer is not required to endure undue hardship in accommodating the disability. 42 U.S.C. § 12112(b)(5)(A).

Even viewing all the disputed evidence in favor of Daugherty, his ADA claim must fail because he did not show that he was treated differently from any other part-time employee whose job was eliminated. Perhaps the city could fundamentally alter its approach towards all its displaced employees. Perhaps it could be more flexible in assigning part-time employees whose jobs are eliminated to full-time positions, more helpful in matching displaced employees to openings in other departments, prompter in lining up job interviews at departments with openings, etc. What Daugherty failed to show, however, was that any such alleged failings were the result of discrimination based on his disability. There was no proof that the city treated him worse than it treated any other displaced employee.

■ Stated another way, we do not read the ADA as requiring affirmative action in favor of individuals with disabilities, in the sense of requiring that disabled persons be given priority in hiring or reassignment over those who are not disabled. It prohibits employment discrimination against qualified individuals with disabilities, no more and no less.

JUDGMENT REVERSED; CASE DISMISSED.