**UNITED STATES EQUAL EMPLOYMENT OPPORTUNITY COMMISSION, Plaintiff,**

v.

**HUMISTON–KEELING, INC., et al., Defendants.**

No. 97 C 5654.

United States District Court, N.D. Illinois, Eastern Division.

March 29, 1999.

Order Denying Reconsideration, July 6, 1999.

---

Jean Powers Kamp, John C. Hendrickson, United States Equal Employment Opportunity Commission, Chicago, IL, John A. Knight, Jeanne B. Szromba, Ethan M.M. Cohen, Equal Employment Opportunity Commission, Chicago, IL, for U.S. Equal Employment Opportunity Commission, plaintiff.

Donald F. Peters, Jr., Christopher Paul Lyons, Law Office of Donald F. Peters, Jr., Chicago, IL, for Humiston–Keeling, Inc., Cardinal Health, Whitmore Distribution Corp., defendants.

## MEMORANDUM OPINION AND ORDER

LINDBERG, District Judge.

The United States Equal Employment Opportunity Commission ("EEOC") has brought this action pursuant to the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. It alleges that defendant, Humiston–Keeling, Inc. ("HK"), violated the Act when it failed to reasonably accommodate an employee with a disability. Both parties have moved for summary judgment.

## I. STATEMENT OF FACTS

Nancy Houser ("Houser"), formerly known as Nancy Cook, began working for HK in 1990. HK, a wholesale pharmaceutical and health and beauty aids supplier, operated a warehouse in Calumet City with both a day and a night shift. Houser began her employment with HK as a "picker" on the night shift. Before joining HK, Houser successfully completed an emergency medical technician course and worked as a certified phlebotomist. During the relevant period, Robert Denta was the operations manager; Marian Nelson was the night shift supervisor; and Richard Meserve was the director of human resources.

During the company's night shift, product in the warehouse is picked, packed and shipped. Two U-shaped "picking" lines are set up, with prescription drugs on one line and over-the-counter product picked on the other. The workers pass a tote, which holds product, down a conveyor belt on each of the lines. Each picker is assigned a zone and picks the items on a customer order that are in his or her zone. The worker then passes the tote down the line to the next worker, who picks the items in that zone. The last person on the line completes the order, signs it and sends it to the dock for shipping.

To carry product from the shelves to the totes, pickers wear aprons that are similar to a chef's apron but with loops on the bottom. By placing one arm through the loops, the picker forms a pouch, into which she places the product she has picked from the shelves with her other arm. While pickers might lift items from a few ounces up to 25 lbs., the parties dispute the frequency of the need to lift items heavier than 5 lbs. HK claims that picking is a group effort and that if one picker gets backed up, the other packers down the line work as a team to correct the bottleneck. Houser disagrees, claiming that each picker was responsible for her portion of the order and that slow pickers were yelled at by both coworkers and supervisors. HK

did not have a quota for pickers but Harry Myers, HK's general manager, indicated that pickers were expected to pick up speed after performing the position for a while and that a slow picker would have an impact on the line. HK also used "floaters," who picked and filled their own separate orders or who helped out a picker with a large customer order in her zone. It is not uncommon for a floater to help out a picker.

In 1991, Houser applied and was hired for a temporary office position as contract administrator in HK's hospital retail contract department. She stated that she wanted the job because she didn't like working the night shift. The contracts department administered contracts between vendors and hospitals or pharmacies, acted as intermediary between the vendor and the buyer, and maintained and audited the contracts. Employees in the department had to enter the buying group's contract price into the computer. If this was done inaccurately, the customer was billed incorrectly and the discrepancy had to be researched and the customer account credited.

Ann Marie Oswald, the supervisor of the contract department, stated that she had a meeting with Houser in December 1991 to discuss problems with Houser's attendance, talking too much and being away from her desk too much. The write-up, which Houser signed, indicates that if she did not improve her performance by January 6, 1992, she would be returned to her warehouse position. Although Houser's performance subsequently improved as to these areas, Oswald later noticed that Houser was entering incorrect prices into the computer, resulting in billing errors to customers. She stated that Houser was making 30 to 40 mistakes per week while other employees averaged five or fewer mistakes per week.

In late January 1992, Oswald and Meserve met with Houser and informed her that they were returning her to her position in the warehouse, which entailed a cut in pay and returning to the night shift. Houser stated that she was angry about returning to the night shift. She subsequently began working as a stocker, which entailed putting cases of products on shelves and replenishing items the pickers had depleted the night before. In May 1992, Houser injured her right arm while at work. Her physician diagnosed the injury as lateral epicondylitis or "tennis elbow." On May 13, 1992, Meserve saw a release for Houser from Dr. Estacio of the Hammond Clinic that stated "no lifting on the right arm." He interpreted this as indicating that Houser should not lift anything, not even a pencil, with her right arm.

Shortly after her injury, HK placed Houser in a full-time light-duty job that involved writing up lists of items that needed to be reshelved and putting away mispicked items. This temporary position was created as an accommodation for Houser and was not continued after she stopped performing it. From May 29, 1992, through June 10, 1992, Houser continued working light-duty writing lists for the stockers and working as a one-armed stocker, cutting and lifting boxes with her left arm.

Houser began seeing Dr. Louis Gluek for treatment at the end of May 1992. He stated that during 1992 and 1993, Houser was significantly limited in lifting with her right arm compared to the average person. He based his recommended physical restrictions on Houser's perception of pain, which he found believable, and not on a diagnosis of the physical condition of her elbow. On July 21, 1992, Dr. Gluek restricted Houser from working at all and fitted her with a cast on July 31. This ultimately did not improve her condition and she had surgery on her elbow in September 1992. In January 1993, after a five-hour work-capacity evaluation conducted at Saint Margaret Mercy Healthcare Center, Houser's "major limiting factors" were listed as: 1) decreased overall endurance in the right upper extremity;

2) decreased tolerance in right upper extremity for task performance especially shoulder level and above; 3) decreased capabilities with lifting; and 4) decreased capabilities with carrying. The lifting evaluation stated that Houser could lift a one-time maximum of 10 lbs. from floor to knuckle height; 12.5 lbs. from 12″ high to knuckle height; 4 lbs. from knuckle height to shoulder level; and 4 lbs. from shoulder level to eye level.

Currently, Houser is unable to lift her grandchild with her right arm; and has pain when using a manual can opener or opening a jar with her right hand. She has taken ceramics classes, continues to cook, grocery shop, vacuum, dust and wash dishes. Houser is currently able to type, use a computer, and lift and carry files. She experiences a dull aching in her arm on an almost daily basis. Houser is right-hand dominant but is also ambidextrous and can write and paint with her left hand. She cannot lift more than 5 lbs. with her right hand without experiencing pain.

In January 1993, Gluek told Houser that the then-current condition of her arm was probably permanent as the treatments she had received were not leading to further improvement. In a release he provided for HK, dated January 8, 1993, Gluek indicated that Houser should perform no lifting with her right arm and should be placed on permanent light duty. Meserve told Houser that HK did not have a permanent light-duty position. He and Bob Denta, the operations manager, discussed the release and Meserve offered Houser a permanent position picking with one arm. The picker position is the lightest-duty warehouse position. Instead of using the standard picker apron that looped over the arm, Meserve testified that he and Denta developed an apron that looped over the neck and formed a pouch in front, similar—they believed—to a Kangaroo Pouch Apron that is commonly used in the industry. Meserve did not expect Houser to lift anything substantial with her right arm while performing the job and did not ex-

pect her to be able to perform at the normal picker rate of speed. The parties disagree as to whether Meserve or Denta told Houser that she would have to hold a clipboard in her right arm to keep from using it. Meserve told Houser she would receive light-duty pay until she picked faster. When Meserve explained the new pouch to Houser, she was angry and told him it would be impossible to do the job that way. Houser testified that she was upset about picking with one arm and about going back to work on the night shift.

Houser attempted the modified picker position for only one night-January 11, 1993. When Marian Nelson, the night shift supervisor, placed the apron around Houser's neck, Houser stated "I don't want to do this" and "I can't do this." Nelson told her to "at least try." Houser testified that she had difficulty placing items in the apron because the top of it closed and she could only place product in through the sides. She also had difficulty removing items that she had placed in the apron and was therefore unable to keep pace with the orders. Houser held a clipboard in her right arm, which became stiff and painful during the shift because she was holding it in the same position for an extended period of time. She completed her picking orders but did not speak to Nelson at the end of the shift about the difficulty she was having. Houser did not attempt to reconfigure the apron and did not go to Denta or Nelson to ask if there was another method to make the job easier. Houser was not given a quota to complete for the evening and was not disciplined for being slow in filling her orders. Floaters helped Houser fill her orders when she fell behind.

Houser did not return to the job the next evening. Meserve does not recall any discussion with Houser about why she did not return although Houser stated that she told him about the pain she experienced from holding the clipboard. Houser went to see Dr. Gluek and told him that she

experienced pain and stiffness in her arm because of having to keep it in one position for an entire shift. He told her that she couldn't do the job or do the job that way. Houser stated that she told Meserve that her doctor told her not to perform the job.

Meserve indicated that he probably spoke with someone at Dr. Gluek's office about Houser's limitations. At that time, there was no other job available that Houser could perform and Meserve testified that he would therefore have told her that if she would not perform the modified picker position, she would have to stay at home and continue her treatment, and the company would put her back to work if her doctor gave her a release. During this time, Houser was on temporary total disability worker's compensation leave.

Sometime in early 1993, Houser had requested a meeting with Larry Olin, the president of Humiston–Keeling. Olin, Meserve and Harry Myers attended the meeting, in which Houser told Olin that all she wanted was to continue working at HK. Olin told Myers to do what he could to accommodate Houser as long as she could perform the duties assigned to her. As the personnel director, Meserve had the responsibility to determine what accommodation an employee required. After a few weeks, Meserve called Houser at home to offer her a job as a "greeter," which involved greeting customers at the door and giving them directions while the entrance of the building was under construction. This position ended in March 1993, when the construction was completed. Meserve told Houser that if she still refused the modified picker job, they were unable to offer her another position at that time and she would have to go back on disability leave. He explained that he would continue to get updated information at least every 30 days and would call her if another assignment such as the greeter position arose. Meserve also told Houser to continue to post her name for office positions and that he would consider her for them.

When a current employee bid for an open position in the company, Meserve looked at the job requirements and at each employee's qualifications. He determined who were the top two or three candidates for the position and set up interviews with the supervisor of the area. That supervisor then decided which of the candidates to hire. HK did not change its transfer policy in regard to Houser. Stocking and picking positions were the lowest paid positions at the company and Meserve stated that many employees signed up for office positions, which were "coveted." He characterized the office positions as "promotions" over the warehouse positions, stating that the office jobs involved greater responsibility and paid more than the warehouse jobs.[1]

In January 1993, Houser bid for an accounts receivable clerk position, which required accounting experience or education, accuracy, math or calculator skills, atten-

---

1. The EEOC filed a motion to strike affidavits that HK filed along with its motion for summary judgment. In those affidavits, Meserve and several other management personnel at HK indicated that the office positions were considered "promotions" over the warehouse positions. The EEOC claims that these assertions are not based on personal knowledge or supporting facts. The court disagrees. First, by virtue of their positions, managers have knowledge of company policy and hierarchy. This is especially true of Meserve, who served as the human resources director. Meserve stated in his deposition that the positions were "coveted" and that quite a few employees signed up when an office position was posted. Second, the assertions that office positions were "promotions" were based on the following factual allegations: they were higher paying than warehouse positions, involved more responsibility and had better conditions (such as no night shift). Also, some of the office positions required more qualifications, such as computer training or a college degree, while the warehouse positions were unskilled. Based on these facts, the court finds that office positions could validly be considered promotions over warehouse positions or at least were desirable positions within the company. Therefore, the EEOC's motion to strike is denied.

tion to detail, dependability, and communication skills. Christine Nagucki was in charge of the accounts receivable department at that time. She had previously interviewed Houser for a position in 1991 and remembered that Houser was unable to answer some credit and debit questions Nagucki had posed to her in the interview. Nagucki stated that she considered accounting experience and education the most important qualification for the accounts receivable position. Houser's resume indicated that she had worked in a college financial aid office although Nagucki stated that such a position involved manual loan processing instead of the computerized accounting the accounts receivable position entailed. No one informed Nagucki that Houser was in need of an accommodation. She did not hire Houser for the position.

In March 1993, Houser bid for a database management clerk position, which required an accurate, detail-oriented person with a working knowledge of the computer system. Houser's resume indicated that she had data-entry experience. Carol Gnerlich was the supervisor conducting the interviews. However, she hired Dorita Katich because she had an excellent interview and appeared eager for the position. Katich returned to the warehouse several weeks later because she did not like the clerk's position and the job listing was again posted. Gnerlich interviewed Houser at this time but did not offer her the position. No one informed Gnerlich that Houser was in need of an accommodation. Gnerlich recalled speaking with Oswald about Houser's work in the contract department and learning that Houser had problems with accuracy while she worked for Oswald.

Houser bid for a temporary telephone operator/receptionist position in May 1993 but subsequently withdrew her name from consideration because she needed a permanent position. In August 1993, Houser bid for a telemarketing position, which required computer knowledge, product knowledge, experience in WordPerfect and Lotus, and general office skills. Charles Maloley, the telemarketing supervisor, interviewed Houser but did not offer her the position. He could not remember anything in particular that rendered Houser qualified or unqualified for the position although defendant asserts that Houser admitted she lacked much of the relevant experience such as proficiency in WordPerfect and Lotus.

In October 1993, the switchboard operator/receptionist position was posted as a permanent position. Although Houser interviewed for the position, the supervisor, Pam Holohan, had decided that she was going to hire Pat Vukovich, who had filled the temporary position for three months. Vukovich had 10 years of experience working as a switchboard operator.

Houser then applied for the positions of internal auditor and assistant credit manager. In total, Houser interviewed for eight office positions at HK, which did not take her disability into account when making the hiring decisions. Houser asserts that two of the positions that had opened up in the company within the relevant time frame were entry-level: the operator/receptionist position and the accounts payable clerk position. HK denies that Houser was qualified for the accounts payable clerk position, as it was an entry-level accounting position, not simply an entry-level unskilled position, and it required some education or training. The company also denies that Houser signed the posting to apply for the position. Houser does not remember whether she signed up for this position.

HK notified Houser in December 1993 that she was being terminated pursuant to the company's extended absence policy, which indicated that an employee who was off work for more than six months was removed from the active employee roster. In January 1994, Houser began working for the Lake County Prosecutor's Office. She then got a job in the civil division of the city of Hammond's clerk's office, and is

currently employed as an assistant utility billing clerk for the town of St. John, Indiana. In these positions, Houser has used a calculator, performed filing, carried legal files, and typed. Houser filed a charge of discrimination with the EEOC, which has filed suit on her behalf. Both parties have moved for summary judgment on liability. Because the court finds that HK met its obligations under the ADA, it grants HK's motion for summary judgment and denies the EEOC's motion for summary judgment.

## II. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). The court must believe the evidence of the non-moving party and construe the evidence in that party's favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

"The plain language of rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party with the burden of proof on an issue may not rest on its pleadings and must make affirmative factual allegations to demonstrate that a genuine issue of material fact exists. *Id.* at 324, 106 S.Ct. 2548. Sufficient evidence that favors the non-moving party must exist before a triable issue can be found. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. Plaintiff must do more than raise "some metaphysical doubt as to the material facts." *Matsushita Electrical In-*

*dustrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). However, because employment cases depend heavily on the intent and credibility of witnesses, these standards are applied with "added rigor." *Sarsha v. Sears, Roebuck & Co.,* 3 F.3d 1035, 1038 (7th Cir.1993).

## III. DISCUSSION

### A. PRIMA FACIE CASE

The EEOC claims that Houser has a disability as defined by the ADA, that this condition rendered her unable to perform the essential functions of her warehouse position even with reasonable accommodations, but that she was qualified to perform other vacant positions at HK. Because HK did not place Houser in any of these vacant positions, they failed to reasonably accommodate her and violated the Americans with Disabilities Act.

Defendant argues that Houser cannot prove that she has a disability as defined by the ADA. In addition, it asserts that Houser is not a qualified individual, that HK provided Houser with a reasonable accommodation and that it was not required to assign Houser to one of its vacant positions as there is no dispute that she was not the most qualified person for any of these positions. HK also claims that Houser was not minimally qualified for most of the positions for which she applied, that each of the open positions constituted a promotion from a warehouse position and that its obligation under the ADA to accommodate Houser did not require it to promote her.

The EEOC's claim can be characterized as one that HK discriminated against Houser by failing to provide a reasonable accommodation. "As such, her claim is not one for disparate treatment under the ADA, but instead is a claim for discrimination under the specific terms of the statute." *Hunt–Golliday v. Metropolitan Water Reclamation District,* 104 F.3d 1004, 1011 (7th Cir.1997) (citing *Bultemey-*

*er v. Fort Wayne Community Schools,* 100 F.3d 1281, 1283 (7th Cir.1996)). "Discrimination" under the statute includes the failure to make a reasonable accommodation for the known physical limitation of an otherwise qualified employee or the denial of employment opportunities to an otherwise qualified employee if such denial is based on the need to make a reasonable accommodation. 42 U.S.C. § 12112(b)(5)(A), (B). The burden-shifting *McDonnell–Douglas* approach is therefore inappropriate and the court will instead apply a reasonable accommodation analysis. *Bultemeyer,* 100 F.3d at 1284. This includes establishing that: 1) Houser has a disability as defined by the ADA, 2) she was a qualified individual under the Act, 3) HK was aware of her disability, and 4) HK failed to provide her with a reasonable accommodation. *Id.* The parties dispute all but the third element.

### 1. DISABILITY

The EEOC must establish that Houser had a disability as defined by Americans with Disabilities Act. To do so, Houser must show that: 1) she has a physical or mental impairment that substantially limits a major life activity; 2) she has a record of such an impairment; or 3) she is regarded as having such an impairment. 29 U.S.C. § 706(8)(B); 29 C.F.R. § 1614.203(a). Houser claims that her chronic tendinitis substantially limits her in the major life activities of lifting and working. She is currently restricted from lifting anything heavier than 5 lbs. with her right arm.

Defendant does not dispute that tendinitis is a physical impairment; it disagrees that the condition substantially limits Houser in any major life activity. First, HK asserts that lifting is not in itself a major life activity. Plaintiff acknowledges that some courts have rejected claims of disability based on the inability to perform heavy lifting. *See, e.g., Ray v. Glidden Co.,* 85 F.3d 227, 229 (5th Cir.1996). Others have specifically found lifting to qualify

as a major life activity. *Lowe v. Angelo's Italian Foods, Inc.,* 87 F.3d 1170, 1174 (10th Cir.1996) (lifting restrictions caused by plaintiff's multiple sclerosis). The EEOC claims that Houser is not just restricted from heavy lifting, she is limited from lifting almost anything at all.

The ADA itself does not contain a definition of "major life activity." In the EEOC's regulations, issued pursuant to 42 U.S.C. § 12116, "major life activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, working and learning." 29 C.F.R. § 1630.2(i). However, the EEOC Compliance Manual indicates that "lifting" is a major life activity. EEOC Compliance Manual § 902.3(b). Without directly addressing the issue, the Seventh Circuit has included lifting in a list of major life activities. *See Duncan v. State of Wisconsin Dept. of Health & Family Services,* 166 F.3d 930, 935 (7th Cir.1999).

It seems an unnecessary question in this case, however, as Houser also alleges that her lifting limitations are restrictive enough to substantially limit her ability to work. She claims this is so because she is precluded from performing "a class of jobs or a broad range of jobs in various classes compared to the average person having comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(I). She alleges that she is unable to perform any of the warehouse positions at HK, which constitute a class of jobs.

█ The Seventh Circuit has considered a plaintiff's lifting restrictions in the context of a claim of being substantially limited in the ability to work. *Cochrum v. Old Ben Coal Co.,* 102 F.3d 908 (7th Cir.1996). The question of whether an impairment constitutes a disability is "an individualized one, and must be determined on a case-by-case basis." *DePaoli v. Abbott Laboratories,* 140 F.3d 668, 672 (7th Cir.1998) (quoting *Roth v. Lutheran Gen. Hosp.,* 57 F.3d 1446, 1454 (7th Cir.1995)). In *DePaoli,* the Seventh Circuit noted that an

inability to perform one job does not constitute a substantial limitation in working. *Id.* at 672. On the other hand, the fact that the employee is qualified to perform some other type of work or another line of work does not necessarily defeat her claim that she is substantially limited in working. *Id.* "The correct test falls somewhere in between those two extremes." *Id.*

■ The analysis requires comparison to the average person having comparable training, skills and abilities. 29 C.F.R. § 1630.2(j)(3)(i). Factors that may be considered include 1) the geographic area to which the person has reasonable access; 2) the job from which the individual is disqualified and the number and types of other jobs using similar training, knowledge, skills and ability from which the person is also disqualified; and 3) other jobs in the area that do not require the same training, knowledge, skills and ability from which the individual is also disqualified. *Id.* at § 1630.2(j)(3)(ii). The EEOC Compliance Manual indicates that an individual who is prevented from performing all heavy labor jobs because of a back injury could be substantially limited in working because a class of jobs has been eliminated as a result of the back condition. EEOC Compliance Manual § 902.4.

■ HK denies that Houser cannot perform a class of jobs because of the inability to use one arm for lifting and specifically denies that she could not perform any of its own warehouse positions. The court does not believe that a limitation has to apply to both arms before it can affect an ability to lift or work. *See Cochrum,* 102 F.3d 908 (7th Cir.1996) (injury to left shoulder and arm). HK also maintains—as it always has—that Houser is still capable of performing the picker position in its warehouse with reasonable accommodation. The question of whether Houser could have successfully filled the warehouse position remains factually disputed.

In *DePaoli,* which is factually similar to the instant case, the Seventh Circuit found that the plaintiff's chronic tendinitis in her hand, which prevented repetitive movement, might substantially limit her in the major life activity of working. *DePaoli,* 140 F.3d at 673. The plaintiff's doctors indicated that she would be unable to perform virtually any employment that required repetitive movement of her right hand. *Id.* A jury question existed as to whether the plaintiff's condition precluded her from performing a class of jobs because this evidence indicated that she was barred from more than just the production-line job she previously held. *Id.* This was true even though that plaintiff had no lifting restrictions. *Id.* The court concluded that the plaintiff was "precluded from a wide group of jobs in the Chicago area economy." *Id.; see also Cochrum,* 102 F.3d at 911. The same could be true for Houser considering the purported breadth of her lifting restrictions. Although she has been able to obtain employment since her medical leave at HK ended, those positions have not been in the same category or class as the warehouse positions at HK. Both appear to involve office work. Therefore, Houser has submitted sufficient evidence to present to a jury the question of whether her tendinitis substantially limited her from working in a class of jobs. However, as in *DePaoli,* the additional questions the court must ask will ultimately make this unnecessary.[2]

2. The EEOC also argues that Houser can prove a disability because HK treatment of her indicates that it regarded her as having a disability. During the relevant time, Houser was on temporary total disability leave. 29 C.F.R. § 1630.2(*l*)(3) ("is treated by a covered entity as having a substantially limiting impairment"). While HK has always maintained that it believed Houser could perform the picker position, it offered her modifications, indicating that it viewed her as having a disability that required a reasonable accommodation. Denta stated that he had an obligation to offer Houser reasonable accommodations. This creates a genuine issue as to whether the company regarded Houser as having a disability.

## 2. QUALIFIED INDIVIDUAL

HK next claims that Houser was not a qualified individual under the Act as she clearly admits that she could no longer perform the essential functions of her position even with a reasonable accommodation. Some courts have held that transfer is required only when an employee can still perform the essential functions of her original position but that the reasonable accommodation required for her to do so constitutes an undue burden on the employer. *Smith v. Midland Brake, Inc.,* 138 F.3d 1304, 1309 (10th Cir.1998) (rejecting "expansive interpretation" of reassignment).

■■■ Under a reasonable accommodation analysis, the employee is qualified if she can perform the essential functions, with or without reasonable accommodation, of the employment position such individual holds or *desires. See Baert v. Euclid Beverage, Ltd.,* 149 F.3d 626, 631 (7th Cir. 1998); 42 U.S.C. § 12111(8) (defining "qualified individual with a disability"). Although "position desired" could presumably be viewed as applying only to an applicant and not a current employee, the Seventh Circuit has held that it also applies to vacant positions within the company when the employee can no longer perform the essential functions of her own position even with reasonable accommodations. *Bultemeyer,* 100 F.3d at 1285. This holding is supported by the EEOC guidelines to 29 C.F.R. § 1630.2(*o*) ("an employer may reassign an individual to a lower graded position if there are no accommodations that would enable the employee to remain in the current position and there are no vacant equivalent positions for which the individual is qualified with or without reasonable accommodation"). Houser claims she was qualified for the office positions she sought at HK. Although this is disputed as to all but one of those positions, it is enough to get her to the final question of her prima facie case: whether HK failed to provide her with a reasonable accommodation.

## 3. REASONABLE ACCOMMODATION AND THE INTERACTIVE PROCESS

### a. The Modified Picker Position

■■■ The EEOC claims that HK discriminated against Houser by "failing to call her back from disability leave despite having vacancies which she was qualified to fill and despite the fact that she affirmatively sought placement in many of these positions," which resulted in her termination when she exhausted her leave time. In the court's view, however, its analysis of the interactive process of reasonable accommodation needs to focus on what happened before Houser began her final disability leave and started applying for new positions. An employee begins the interactive accommodation process when she informs the employer of her disability. *Beck,* 75 F.3d at 1134. The employer is then required to engage in informal communication with the employee so that they can together determine if an accommodation is necessary and what would be an appropriate accommodation. *Bombard v. Fort Wayne Newspapers, Inc.,* 92 F.3d 560, 563 (7th Cir.1996). The employer must make a reasonable effort to explore accommodations with the employee. *See Miller v. Illinois Dept. of Corrections,* 107 F.3d 483, 486–87 (7th Cir.1997).

■■■ The EEOC complains about Meserve and Denta coming up with ideas on their own and presenting them to Houser "without consultation" with her. However, an employer is required to initiate an informal interactive process. "An employer has at least some responsibility in determining the necessary accommodations." *Beck v. University of Wisconsin Board of Regents,* 75 F.3d 1130, 1135 (7th Cir.1996). The court finds that the ideas that Meserve and Denta came up with to allow Houser to perform the picker position met their initial obligation to provide a "reciprocal response" to the notification from Houser of her disability and its attendant

limitations. *See Haschmann v. Time Warner Entertainment Co.*, 151 F.3d 591, 601 (7th Cir.1998). There was nothing to prevent Houser from responding or approaching Meserve or Denta with her own suggestions or complaints, as she did when she requested a meeting with Olin and Meserve to discuss her desire to continue working for HK.

Houser rejected the modified picker position because "she could not perform this job because it took her too long to pick using only one arm—her non-dominant arm, and because it caused her pain." Houser stated that carrying a clipboard in her injured arm for an entire shift resulted in stiffness and pain. The purpose of requiring Houser to carry a clipboard was to keep her within her physical restrictions and prevent her from inadvertently lifting with her right arm. The fact that the company took the "no lifting with right arm" restriction seriously and attempted to work around it should not be held against it. *See Steffes v. Stepan Co.*, 144 F.3d 1070, 1072 (7th Cir.1998) (company took doctor's order of "no exposure to chemicals" seriously and obligation to update company on changes in blanket restriction fell to plaintiff).

The discomfort Houser experienced would be a legitimate complaint if it had been fairly discussed and presented to HK. Houser stated that she went to see Dr. Gluek after her shift and told him that she experienced pain in her arm because of having to hold a clipboard and keep it in one position for an entire shift. Based on this explanation, Dr. Gluek responded that she "could not perform the job that way." Plaintiff itself states that "Dr. Gluek testified that pain was the basis for Houser's restrictions." Houser then told Meserve that her doctor told her that she could not perform the job.

At this stage in the interactive process, Houser was the only person with complete information concerning her restrictions and the basis for her doctor's opinion. She did not disclose the reasoning behind her doctor's recommendation and therefore did not meet her obligation to cooperate with HK and determine what accommodations would make the job feasible. Holding a clipboard was certainly not essential—and in fact was not even related—to performing the picker job. Rather, it was geared toward preventing Houser from violating the physical restrictions her doctor had previously prescribed. Even if Houser explained to Meserve that her arm was stiff and painful, she did not explain that the clipboard was unnecessary for her to comply with her doctor's restrictions and that she was still allowed to move and stretch her right arm even if she was not supposed to lift with it. She also told Meserve that her doctor told her not to perform the job. This was not enough to put Meserve on notice that the doctor's recommendation was based on Houser's having to hold a clipboard and not on an inability to perform the essential functions of the modified picker position. "Courts should look for signs of failure to participate in good faith or failure by one of the parties to make reasonable efforts to help the other party determine what specific accommodations are necessary." *Beck*, 75 F.3d at 1135. If Houser had discussed her difficulties more completely, Meserve may have lifted the requirement that Houser hold a clipboard, which in turn would have eliminated the pain performing the job caused.

The EEOC claims that Houser must have said "something" to convince Meserve that she could not perform the picker position because Meserve placed her back on disability leave. As the above discussion indicates, Meserve's decision was based on Dr. Gluek's statement that Houser could not perform the job. However, Meserve did not have full information as to the reasons for Dr. Gluek's opinion, information only Houser possessed at the time. Moreover, Meserve subsequently indicated to Houser that the modified picker position was still available for her if she wanted it.

As to Houser's second complaint about the position, that she worked too slowly, this was simply not her decision to make. Houser attempted the modified position for only one evening and, in effect, quit without further discussion with her supervisors or the human resources department. She made this decision unilaterally, even though she completed her orders on the night in question, was not disciplined for falling behind, was aided by floaters, and was allowed to take smaller orders.[3] Allowing her to work more slowly than other pickers was part of the offered reasonable accommodation. "The ADA does not obligate an employer to provide a disabled employee every accommodation on [her] wish list." *Miranda v. Wisconsin Power & Light Co.*, 91 F.3d 1011, 1016 (7th Cir. 1996) (citing *Lester Schmidt v. Methodist Hosp. of Indiana, Inc.*, 89 F.3d 342, 344–45 (7th Cir.1996)).

Had Houser discussed the specific problems she experienced with the modified picker position, including the clipboard and the difficulty with the pouch staying open, it is possible that HK would have responded. At any rate, Houser cannot argue otherwise because she did not attempt to find another solution with Meserve. The court does not find that this places an undue burden on employees, who must participate fully in the interactive process. "Both parties bear responsibility for determining what accommodation is necessary." *Bultemeyer*, 100 F.3d at 1285. Without such a responsibility on employees, determining what reasonable accommodation is appropriate would become more difficult and the ADA ultimately less effective at its primary goal: keeping employees with disabilities working.

As a final matter, Houser's failure to stay in the position for more than one night bars her from claiming that the position was simply a pretext for constructive discharge because she would have eventually lost her job for working too slowly. Again, allowing her to work slowly was part of the offered reasonable accommodation. Houser's assertion that it was "impossible" to perform the picker position with only one hand is simply not supported by any evidence as she did not stay in the position long enough to prove that point. Had she stayed in the job and been disciplined or terminated for not timely filling orders, the result here might have been different, but that is simply not the case before the court.

### b. Other Vacant Positions

■■■ Even if the modified picker position was unworkable, the court finds that HK met its subsequent burden to consider Houser for alternative positions. It is true that if an offered reasonable accommodation is ineffective or if no reasonable accommodation can be found that allows the employee to stay in her current position, the employer must consider reassignment to a vacant position for which the plaintiff is qualified as another form of reasonable accommodation.[4] 42 U.S.C. § 12111(9)(B); *Gile v. United Airlines, Inc.*, 95 F.3d 492, 498 (7th Cir.1996). An employee's open-ended request to continue working for a company obligates the employer to consider placing the employee in a vacant position for which the employee is qualified. *Miller*, 107 F.3d at 486–87. The employer must consider reassigning the employee to a position for which she is qualified, mean-

3. Although the parties disagree over the general opinion in the warehouse as to whether the position could be performed with one hand, the court does not find this type of workplace rumor or speculation appropriate for consideration in a motion for summary judgment.

4. After Houser refused the modified picker position, HK offered her the temporary greeter position, which was a reasonable accommodation and which also allowed her to extend the time she had under the extended absence policy to apply for other positions. The EEOC agrees that this temporary position was a reasonable accommodation and does not contend that HK was obligated to turn it into a permanent one.

ing that she must possess the listed qualifications for the job and be able to perform the essential functions of that position with or without reasonable accommodation. *Dalton v. Subaru–Isuzu Automotive, Inc.,* 141 F.3d 667, 678 (7th Cir.1998). However, the employer's duty to reassign has been held to be significantly limited. *Id.* at 679 (discussing case law). Employers do not have to violate the provisions of a collective bargaining agreement. *See, e.g., Cochrum,* 102 F.3d at 912–13. They do not have to ignore a valid seniority system, even if no CBA exists. *See, e.g., Foreman v. Babcock & Wilcox Co.,* 117 F.3d 800, 810 (5th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 1050, 140 L.Ed.2d 113 (1998). They are free to consider an employee over- or under-qualified for a position and to give a preference to full-time over part-time workers. *See, e.g., Senner v. North-central Technical College,* 113 F.3d 750, 756–57 (7th Cir.1997); *Daugherty v. City of El Paso,* 56 F.3d 695, 699 (5th Cir.1995). Nor are they required to violate existing policies against demoting employees back into production positions or to promote employees to more desirable positions. *Duckett v. Dunlop Tire Corp.,* 120 F.3d 1222, 1225 (11th Cir.1997); *Malabarba v. Chicago Tribune Co.,* 149 F.3d 690, 700 (7th Cir.1998). Employers do not have to turn temporary light-duty positions into permanent ones. *Dalton,* 141 F.3d at 680.

■ Houser met with the president of HK and made an open-ended request to continue working at the company. At the time that she stated that she could not perform the modified picker position, there were no other positions available.[5] Meserve subsequently assigned her to the temporary, light-duty greeter position. When that position ended, he told her to bid on posted jobs. She applied for eight office positions, was interviewed for several and rejected from all as not the most qualified applicant. This was all done according to company policy of interviewing the two or three best candidates and allowing the area supervisor to decide which was the most qualified.

HK has conceded that Houser had the minimum qualifications only for the switchboard/receptionist position although it asserts that she was not the most qualified applicant. The EEOC maintains that it need only point to this one position to make its case. It claims that if Houser were merely considered along with other nondisabled workers, the provision requiring employers to consider reassigning an employee with a disability becomes a nullity. "To simply allow a disabled employee to apply for a job along with other employees is to offer the employee nothing to which she is not already entitled." In other words, HK was obligated under the ADA to transfer Houser to a vacant position for which she possessed the minimum qualifications, regardless of whether or not she was the most qualified applicant. The EEOC has specifically narrowed the issue in the case to this. There is no disparate treatment claim alleged. It has indicated that the supervisors making the hiring decisions were not informed of Houser's need for accommodation and therefore did not make it part of their decision-making process. Plaintiff does not claim that Houser was the most qualified applicant for the positions, it merely contends that she was sufficiently qualified to be hired for at least one of them. As the EEOC poses it, "the question then becomes, can HK show any legitimate, lawful basis for defendant's refusal to place Houser in one of the vacancies for which she was qualified."

The Seventh Circuit has held that reassignment to a lateral position, even if "wholly distinct and different," is an appropriate accommodation and must be considered. *Gile,* 95 F.3d at 498. That is merely the first question. More recently, the court has held that summary judgment

---

5. Although neither party characterizes it as such, the modified picker position actually constitutes a transfer to a new position, as Houser had been working as a stocker when she injured her arm.

was inappropriate where a factual dispute existed as to whether a vacant position was actually available and also as to whether the employer had a legitimate hiring policy that prevented it from reassigning the plaintiff to an open position. *Baert,* 149 F.3d at 633. However, under the *existing* union contract in *Baert,* the employer would have been *required* to hire the plaintiff into one of the positions at issue—if it had indeed been vacant—because he had the most seniority. *Id.* In another recent case that both parties cite, the Seventh Circuit considered whether an employer's medical layoff policy violated its duty to provide reasonable accommodations to employees with disabilities. *Hendricks–Robinson v. Excel Corp.,* 154 F.3d 685 (7th Cir.1998). However, the plaintiffs' allegations were that they had been considered only for production jobs, not non-production jobs, and that they did not have access to openings in non-production positions. *Id.* at 694.

These cases involve situations where a factual dispute existed as to whether the employer met its initial obligation to at least consider an employee for the range of possibly available positions. They also address the question of what class of jobs is appropriate for reassignment. For that reason they are not entirely applicable to the instant case, in which the range of positions is not disputed. Houser applied for and was considered for the position in question. The only question left is whether HK was obligated to hire her for it. The EEOC cites *Dalton* as support for its position. However, the following discussion appeared in that case:

> "The employer must first identify the full range of alternative positions for which the individual satisfies the employer's legitimate, nondiscriminatory prerequisites, and then determine whether the employee's own knowledge, skills, and abilities would enable her to perform the essential functions of any of those alternative positions, with or without reasonable accommodation. The

employer's duty to accommodate requires it to *consider* transferring the employee to any of these other jobs, including those that would represent a demotion." *Id.* at 678 (emphasis added).

The court finds the word "consider" instructive, as the Seventh Circuit also noted in *Dalton* that an employer is not required to reassign a disabled employee when the transfer would violate legitimate, nondiscriminatory company policies. "The contrary rule would convert a nondiscrimination statute into a mandatory preference statute, a result which would be both inconsistent with the nondiscriminatory aims of the ADA and an unreasonable imposition on the employers and coworkers of disabled employees." *Id.* at 679.

In *Malabarba,* the Seventh Circuit rejected the plaintiff's suggestion that he be considered for higher-level positions. *Malabarba,* 149 F.3d at 700. It quoted the Fifth Circuit's ruling in *Daugherty* that "the ADA does not mandate a policy of 'affirmative action' in favor of individuals with disabilities, in the sense of requiring that disabled persons be given priority in hiring or reassignment." *Id.* (quoting *Daugherty,* 56 F.3d at 700).

Given this indication from the Seventh Circuit, the court can only rule that HK was not required to place Houser in the switchboard/receptionist position when it viewed another employee as more qualified. This would require it to have given Houser priority in reassignment over her more-qualified coworkers. If employers are allowed to prefer full-time over part-time workers, more senior employees over junior employees, and to have policies against demotions even when the employee would agree to a demotion, it seems that HK's hiring the most qualified employee for the job is permissible as it resulted from a legitimate, nondiscriminatory policy. The fact that no supervisor who interviewed Houser knew that she needed a reasonable accommodation it indicates that HK followed its general hiring practices as to Houser. Certainly, if no supervisor

knew of Houser's disability or need for accommodation, her disability could play no role at all in their hiring decisions. *Id.* at 627–28.

At least one other district court following the Seventh Circuit's guidance has come to the same conclusion. *See Thompson v. Dot Foods, Inc.,* 5 F.Supp.2d 622, 627 (C.D.Ill.1998). In *Thompson,* the plaintiff felt that he should have been hired for a vacant position as a reasonable accommodation of his disability. A total of 31 applicants applied for the position in question; the employer interviewed some and selected the most qualified. *Id.* The court declined to find this a violation of the duty to consider reassignment as a reasonable accommodation. *Id.*

Although this holding obviously limits the breadth of a disabled employee's right to reassignment, it does not, as the EEOC suggests, turn the requirement into a nullity. As the cases discussed above indicate, an employer must make an initial determination if a vacant position exists that the employee can perform. *See Malabarba,* 149 F.3d 690. HK did just that when it offered Houser the modified picker position. An employer that has a large number of similar positions or several locations is required to review openings across those job descriptions and locations. *See Gile,* 95 F.3d 492. This provides the employee initial access to positions she might not otherwise learn about, as not all companies post notices. *Id.; see also Hendricks–Robinson,* 154 F.3d 685. Reasonable accommodation involves an interactive process that requires communication between employer and employee. The employer's responsibility to undertake a review of positions available in the company logically furthers this process as the employer is the only entity that possesses such information. Requiring disclosure of and consideration for open positions, even without mandating priority in hiring, will in many cases lead to reassignment that would not otherwise occur.

As a separate basis for summary judgment, HK maintains that the positions for which Houser applied were promotions over warehouse positions. There is no obligation under the ADA to promote an employee who can no longer perform the essential functions of her position. *Malabarba,* 149 F.3d at 699. The EEOC disagrees that the office positions were more desirable and Houser stated that she preferred working in the warehouse. As indicated above, HK supported this contention with the factual allegations that the office positions paid more, involved more responsibility, were skilled, and had no night shift. Whether or not these are "promotions" over the warehouse positions, they were generally desirable positions within the company that employees competed for. This is sufficient to find that they were above the "equivalent position" for which an employer is required to consider an employee with a disability who can no longer perform her own position. *Id.* at 700.

As a final matter, the court notes that it does not find HK's policy of requiring Houser to bid for positions a failure of the reasonable accommodation process. It informed her that it would consider her for any job she bid for. In *Hendricks–Robinson,* the company claimed that it would have considered the laid-off employees for any non-production job for which they applied. 154 F.3d at 694. However, the record before the court indicated that it was questionable whether the company afforded the employees an adequate opportunity to learn about the openings. First, the employer had informed the employees that it would automatically bid them for all open positions, not just production positions, leaving the employees with the mistaken impression that bidding for all open positions would be done for them. *Id.* at 695. Also, the employees had no access to job openings, which were posted inside the plant, because employees on medical leave were not allowed to enter the plant premises. *Id.* These two possible obstacles to

consideration barred summary judgment. No such factual allegations have been raised in this case. HK informed Houser that she could post for any opening. There is no indication that she did not have access to the listings, in fact, she posted for several positions. No breakdown of the interactive process occurred here. For these reasons, the court finds that HK satisfied its obligation to consider Houser for vacant positions within the company.

## III. CONCLUSION

For the foregoing reasons, the court finds that a genuine issue of material fact exists as to whether Houser has a disability as defined by the Americans with Disabilities Act. However, it finds that HK met its obligation to engage in an interactive process for determining a reasonable accommodation to Houser and that it adequately considered her for transfer to vacant positions within the company.

**ORDERED:** The court denies plaintiff's motion to strike and plaintiff's motion for partial summary judgment. The court grants defendant's motion for summary judgment.

## MEMORANDUM OPINION AND ORDER

Plaintiff, the U.S. Equal Employment and Opportunity Commission, has filed a motion to reconsider and to alter or amend the judgment. The court granted summary judgment to defendant, Humiston–Keeling, on plaintiff's claim pursuant to the Americans with Disabilities Act that it brought on behalf of Nancy Houser. The court found, among other things, that defendant did not violate its obligations to provide a reasonable accommodation under the ADA when it offered Houser a modified warehouse position and when it hired a more qualified candidate for a vacant office position.

In its motion, the EEOC maintains that its *Enforcement Guidance on Reasonable Accommodation and Undue Hardship*

*Under the Americans with Disabilities Act,* released March 1, 1999 (approximately a month before the court's opinion on the cross motions for summary judgment issued), directs a result contrary to the one reached by this court. In its previous opinion, the court found that Humiston–Keeling had met its burden to engage in the interactive process and to provide a reasonable accommodation to Houser when it offered her a modified picker position. Plaintiff asserts that the Guidance indicates that Humiston–Keeling did not fulfill its obligations because it did not further question Houser about what reasonable accommodation she needed to perform the picker position. At the point that Houser informed her supervisors that her doctor told her not to perform the job, the EEOC maintains, Humiston–Keeling should have questioned Houser as to what further modifications it could provide that would allow her to perform the position.

In support of this argument, the EEOC has not pointed to any new information from the Guidance and simply reargues the court's interpretation of the facts. The court found that Houser's supervisors responded to her doctor's description of her limitations with the modified picker position. After attempting the position for one shift, Houser failed to return to the job, did not tell her supervisor specifically what about the position irritated her condition, and informed her supervisor simply that her doctor told her she could not perform the position. Considering Houser's report of her doctor's blanket prohibition from performing the position, the EEOC's assertion that Humiston–Keeling should have responded with additional questions or suggestions is unpersuasive. Although the EEOC claims that "nothing in the ADA requires an individual to use legal terms or to anticipate all of the possible information an employer may need in order to provide a reasonable accommodation," the court did not hold Houser to such a strict standard, or find that she had failed to comply with some complicated

procedure. An employee can be as responsible for the breakdown in the interactive process as an employer citing *Bultemeyer v. Fort Wayne Community Schools*, 100 F.3d 1281, 1285 (7th Cir.1996).

The next issue the EEOC raises concerns the extent of an employer's obligations to reassign an employee to a vacant position for which she is minimally qualified. The court found, pursuant to language from several Seventh Circuit cases, that Humiston–Keeling's policy of competitive hiring among current employees for open office positions was a "legitimate, nondiscriminatory policy." The Seventh Circuit has held that an employer does not have to disregard legitimate, nondiscriminatory policies when considering an employee who can no longer perform her position for another, vacant position. *See, e.g., Cochrum v. Old Ben Coal Co.*, 102 F.3d 908, 912–13 (7th Cir.1996); *Senner v. Northcentral Technical College*, 113 F.3d 750, 756–57 (7th Cir.1997).

The new EEOC Guidance states that "the employee does not need to be the best qualified individual for the position in order to obtain it as a reassignment." The EEOC points out that "the Agency specifically rejected the holding of the 5th Circuit in *Daugherty v. City of El Paso*, 56 F.3d 695 (1995)," which this court cited in its previous opinion. It claims that because the Seventh Circuit has not addressed the specific issue of reassignment when the employee is not the most qualified candidate for a vacant position, this court must give deference to the EEOC Guidelines.

This assertion ignores several points in the court's opinion. First, the Seventh Circuit has not rejected the Fifth Circuit's holding in *Daugherty* and has in fact cited it with approval. *Malabarba*, 149 F.3d at 700 (quoting the Fifth Circuit's ruling in *Daugherty* that "the ADA does not mandate a policy of 'affirmative action' in favor of individuals with disabilities, in the sense

of requiring that disabled persons be given priority in hiring or reassignment"). Although it is true that the Seventh Circuit has not addressed the specific issue of whether an employer is free to choose the most qualified employee for an open position, this court specifically found that considering the language the appellate court has used when addressing similar issues, its own latitude in finding an employer's legitimate, nondiscriminatory policy invalid was limited. In addition to the language cited above, this court relied on the Seventh Circuit's language from *Dalton* that "(t)he contrary rule would convert a nondiscrimination statute into a mandatory preference statute, a result which would be both inconsistent with the nondiscriminatory aims of the ADA and an unreasonable imposition on the employers and coworkers of disabled employees." *Dalton v. Subaru–Isuzu Automotive, Inc.*, 141 F.3d 667, 679 (7th Cir.1998). In terms of precedential authority for this court, the EEOC Guidance's rejection of the Fifth Circuit's holding in *Daugherty* simply does not trump the Seventh Circuit's reliance on it or the Seventh Circuit's own indication that the ADA is not a "mandatory preference statute."

The EEOC also submitted a recent opinion in which the Tenth Circuit rejected the argument that "the reassignment duty imposed by the ADA is no more than a duty merely to consider without discrimination a disabled employee's request for reassignment along with all other applications the employer may receive from other employees or job applicants for a vacant position." *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1164 (10th Cir.1999).[1] The court is aware, and was aware during its consideration of the parties' motions for summary judgment, that a conflict over this issue existed in the federal courts. Again, this does not affect its obligation to interpret the ADA according to Seventh Circuit

---

**1.** The court notes also that Humiston–Keeling's policy—and its holding—was limited to situations where current employees—and not outside applicants—were also being considered for a vacant position.

guidance. The court must follow what it believes is the Seventh Circuit's current indication that the ADA does not mandate preferential treatment when reassigning an employee who can no longer perform her position. It therefore declines to alter its holding that Humiston–Keeling's policy violated Houser's rights under the ADA by refusing to assign her to a vacant position.

Finally, the EEOC "respectfully submits that the court is incorrect when it states that an employer need not consider transferring a disabled employee to jobs that are 'generally desirable.'" This refers to the court's statement in its previous opinion that "whether or not these are 'promotions' over the warehouse positions, they were generally desirable positions within the company that employees competed for." The EEOC has misconstrued the court's holding. The court's statement merely indicated that Humiston–Keeling did not have to prove that the positions were "promotions" in the sense that the office division would be positioned directly above the warehouse division in some type of corporate structure chart. The warehouse and office were separate divisions; one was not above the other in the sense that a warehouse worker could expect to be "promoted" into an office position if she performed well. That does not mean that the office positions would not be considered higher-grade positions, which is all the court indicated when it called them "desirable." This finding was based on the facts included in the record that the office positions paid more, required more skills, and had better working conditions and more chance for advancement. Nothing in the motion to reconsider has challenged the factual basis for the court's findings that the office positions were higher-level positions than the warehouse positions. Employers are not required to promote the employee requiring reassignment into a higher-grade position. *Malabarba v. Chicago Tribune Co.*, 149 F.3d 690, 700 (7th Cir.1998).

For the foregoing reasons, the court denies the EEOC's motion to reconsider and to alter and amend the judgment in this case.

**ORDERED:** The court denies plaintiff's motion to reconsider and to alter and amend the judgment.